UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RAFAL LOJEWSKI, SMITH GARCIA, DANIELLE
GARCIA, MANUEL ACEVEDO, ISAMAR DELACRUZ,
*on behalf of themselves and all others similarly situated,*

                                          Plaintiffs,                     22 Civ. 10816 (PAE)

                    -v-                                                   OPINION & ORDER

GROUP SOLAR USA, LLC, SOLAR MOSAIC, INC.,
SALAL CREDIT UNION, DANIEL YOMTOBIAN CORP.
D/B/A SOLAR PROGRAM,

                                          Defendants.

---

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Rafal Lojewski, Smith Garcia, Danielle Garcia, Manuel Acevedo, and Isamar

Delacruz allege that they were fraudulently induced by defendants into purchasing and installing

solar panels for their homes.  Dkt. 36 ("First Amended Complaint" or "FAC") ¶¶ 1–2.  They

bring individual claims, and claims on behalf of all similarly situated New York consumers,

against defendants Group Solar USA, LLC ("Group Solar"), Solar Mosaic, Inc.[1] ("Solar

Mosaic"), Salal Credit Union ("Salal"), and Daniel Yomtobian Corp. d/b/a Solar Program

("Solar Program").  *See id.* ¶¶ 149–262.

Solar Mosaic has made two motions directed to claims by Smith Garcia ("Mr. Garcia")

and Danielle Garcia ("Ms. Garcia," and together with Mr. Garcia, the "Garcias").  First, it moves

---

[1] The FAC names Solar Mosaic, Inc. as defendant. *See* Dkt. 36 ("FAC").  Solar Mosaic states
that the proper defendant in this suit is Solar Mosaic LLC, the successor-in-interest to Solar
Mosaic, Inc.  Dkt. 17 ("Mot.") at 1 n.1.  The Court here treats plaintiffs' claims against Solar
Mosaic, Inc. as extending to Solar Mosaic LLC.  References to Solar Mosaic in this decision
encompass both Solar Mosaic, Inc. and Solar Mosaic LLC.

to compel arbitration of their claims against Solar Mosaic; if this motion is granted, it requests that the Court stay the Garcias' claims against Solar Mosaic, Group Solar, and Solar Program pending arbitration, *see* Dkts. 16, 17 ("Mot."). Second, it moves to dismiss the Garcias' claims for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), and alternatively to strike the Garcias' class claims for failing to satisfy multiple requirements of Federal Rule of Civil Procedure 23, *see* Dkts. 42, 43.[2]

For the following reasons, the Court (1) grants Solar Mosaic's motion to compel arbitration, (2) stays the Garcias' claims against Solar Mosaic, Group Solar, and Solar Program pending arbitration of their claims against Solar Mosaic, and (3) denies Solar Mosaic's motion to dismiss the Garcias' claims and to strike their class claims, without prejudice to the pursuit of these claims in arbitration.

## I.    Background

### A.    Factual Background[3]

#### 1.    The Parties

Mr. Garcia and Ms. Garcia are residents of the Bronx. FAC ¶ 11.

---

[2] Solar Mosaic has so moved against only the Garcias' claims. Mot. at 1 n.2; Dkt. 43 at 3 & n.3. This decision thus does not disturb claims by the other plaintiffs. Nor does this decision address the pending motion by a separate defendant, Salal, to compel arbitration of all claims against it, pursuant to a different agreement, or, in the alternative, to dismiss all claims against it. *See* Dkts. 45, 46.

[3] The factual background recited here is limited to the facts necessary to resolve the pending motion. It thus excludes, among other things, allegations by other plaintiffs. Solar Mosaic filed the instant motion to compel arbitration before plaintiffs filed the First Amended Complaint, but it represents that its motion is "not impacted" by the FAC. *See* Dkts. 37, 39. Accordingly, the Court draws its factual account from the FAC, the operative complaint, and the exhibits attached to the parties' briefs, including the declaration of Jeff Rothenberg, Dkt. 18 ("Rothenberg Decl."); the home solar loan documents, Dkt. 18-1, including the Agreement; the declaration of Ms. Garcia, Dkt. 44-1 ("Ms. Garcia Decl."); and the declaration of Mr. Garcia, Dkt. 44-2 ("Mr. Garcia Decl.").

Group Solar and Solar Mosaic are Delaware-based corporations authorized to do business in New York. *Id.* ¶ 15. Solar Program is a New York corporation, for which Daniel Yomtobian is both a principal and employee. *Id.* ¶¶ 16, 65. Salal is a state-chartered banking association in Washington. *Id.* ¶ 14.

### 2. The Garcias' Transaction with Solar Mosaic

On or about March 6, 2021, a salesperson representing Group Solar and Solar Mosaic contacted the Garcias. *Id.* ¶¶ 39, 53. The salesperson described various incentives that "piqued the Garcias' interest," including an offer to participate in the "Welcome Checks" program. *Id.* ¶ 40; *see also* Dkt. 44-1 ("Ms. Garcia Decl.") ¶ 3; Dkt. 44-2 ("Mr. Garcia Decl.") ¶ 3. Under that program, upon a customer's purchase and installation of a residential solar panel system, she would receive three Welcome Checks worth a total of $6,606—a figure that would cover the first 18 months of financing charges for the panels. FAC ¶ 40. The salesperson gave the Garcias a written proposal (the "Proposal") that included the words "Welcome Check Incentive . . . . $6606" and provided that the Garcias would pay (1) $367 per month for the first 18 months, and (2) $344.50 per month "out of pocket with all credits applied" for the remaining 282 months of the contract. *Id.* ¶ 42. The Proposal further provided for 30 solar panels at a "Total System Price" of $82,000. *Id.* ¶ 43.

---

In deciding motions to compel arbitration under the FAA, the Court applies a standard similar to that applicable for a motion for summary judgment, and therefore considers materials outside the FAC. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (stating that courts may consider, in resolving motion to compel arbitration, "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . the affidavits" (citation omitted)); *Ventoso v. Shihara*, No. 19 Civ. 3589 (PAE), 2019 WL 9045083, at *1 n.2 (S.D.N.Y. June 26, 2019) (same).

The Garcias "eventually" agreed to move forward with the installation. *Id.* ¶ 45.  On

June 2, 2021, a representative of Solar Mosaic and Group Solar came to the Garcias' residence.[4]

*Id.* ¶¶ 46–47.  The representative showed Ms. Garcia an electronic tablet screen "for the purpose

of collecting her signature" on the Home Solar Loan Documents (the "Documents"), which

included the loan agreement (the "Agreement"). *Id.* ¶ 48.  The Garcias describe the Agreement

as a "consumer credit contract made in conjunction with a purchase money loan," so as to

facilitate the purchase of the solar panel system. *Id.* ¶ 54.

Ms. Garcia digitally signed the agreement. *Id.* ¶¶ 49–50.  Ms. Garcia states, however,

that she was neither shown nor told about the text or terms of the Agreement, and that none of its

terms and provisions were visible on the screen she was shown and asked to sign digitally. *Id.*;

Ms. Garcia Decl. ¶¶ 7, 12, 23.  Ms. Garcia states that "[t]he visible area of the tablet screen only

showed a rectangular area to digitally sign," and "the screen contained no visible reference to a

link or other place where additional terms and conditions of the finance terms and purchase of

the solar panel system could be viewed prior to signing the agreement." Ms. Garcia Decl. ¶¶ 8–

9; *see also* Mr. Garcia Decl. ¶ 8.

While Ms. Garcia signed the Agreement, Mr. Garcia was present across the room, across

the kitchen island.[5]  FAC ¶ 51; Mr. Garcia Decl. ¶ 6.  Mr. Garcia states that he "was not asked to

---

[4] The FAC suggests, but does not explicitly state, that the "representative" who obtained Ms. Garcia's signature was the same "salesman" who visited their residence in March 2021. *See* FAC ¶ 61.

[5] On this point, the original Complaint differs from the FAC.  The Complaint alleges that, when a Group Solar representative visited the Garcias' residence on June 2, 2021, Ms. Garcia was not present, Dkt. 1 ¶ 45, and that Mr. Garcia "electronically signed the documents on his wife's behalf," *id.* ¶ 50.  The FAC, in contrast, alleges that both Ms. Garcia and Mr. Garcia were present for the visit, FAC ¶¶ 47, 51; Ms. Garcia signed the Agreement, *id.* ¶¶ 49–50; and Mr. Garcia "was told" that he did not need to sign it, *id.* ¶ 51.  Both the Complaint and FAC state that the Garcias did not have an opportunity to review or scroll through the documents on the iPad.

sign and was never given the tablet." Mr. Garcia Decl. ¶ 6. He "observed that Mrs. Garcia was

shown the tablet solely for the purpose of giving her signature." FAC ¶ 51. He states that the

representative told him that he did not need to submit a credit application or sign any agreement.

*Id.*; Mr. Garcia Decl. ¶ 7; *see also* Ms. Garcia Decl. ¶¶ 10–11.

According to the Garcias, neither of them was "given an opportunity to review the

documents or permitted to scroll through the documents on the iPad," and they "were unaware of

the terms contained therein, including the existence of any agreement(s) to arbitrate." FAC ¶ 60;

*see also* Ms. Garcia Decl. ¶ 12; Mr. Garcia Decl. ¶ 8. Ms. Garcia states that they were never

aware of any arbitration clause and "certainly never agreed to arbitrate." Ms. Garcia Decl. ¶ 23.

Jeff Rothenberg, the senior director of credit operations at Solar Mosaic, states that it is

Solar Mosaic's "regular business practice to have customers electronically sign Home Solar

Loan Documents electronically via the website www.DocuSign.com." Dkt. 18 ("Rothenberg

Decl.") ¶ 5. Rothenberg states that this practice was followed with respect to Ms. Garcia's

agreement with Solar Mosaic; that the Documents presented "contain[] an arbitration

agreement"; and that "Ms. Garcia's electronic signature appears on the final page of the

arbitration agreement." *Id.* ¶ 6.

---

*See* Compl. ¶ 51 ("Neither Mr. Garcia nor Mrs. Garcia was given an opportunity to review the documents or permitted to scroll through the documents on the iPad."); FAC ¶ 60 ("Neither Mr. Garcia nor Mrs. Garcia were given an opportunity to review the documents or permitted to scroll through the documents on the iPad and [both] were unaware of the terms contained therein, including the existence of any agreement(s) to arbitrate.").

Because Solar Mosaic filed the pending motion to compel arbitration before plaintiffs filed the FAC, Solar Mosaic's opening motion to compel arbitration is premised in part on the original account under which Mr. Garcia signed the Agreement. *See* Mot. at 9. The Court resolves the motion, however, under the FAC, as the operative complaint, mindful of Solar Mosaic's assessment that its motion was "not impacted" by the FAC's filing, *see* Dkt. 37.

At some point, the representative provided the Garcias with an invoice, dated June 2, 2021, that cited a payment of $82,000 for a 12.4-kilowatt system. FAC ¶ 62. The invoice lists Solar Program as the "seller/installer." *Id.* ¶ 63. Aside from their interactions with the representative/salesperson on March 6, and June 2, 2021, the Garcias did not have other "dealings" with Solar Mosaic during "the sale and financing process." *Id.* ¶ 61.

### 3.    Terms of the Agreement

Solar Mosaic has produced the Documents. These contain: (1) a consent to electronic receipt of loan disclosures, Dkt. 18-1 at 3–4; (2) an authorization for Solar Mosaic to share information with the installation contractor, *id.* at 5; (3) a disclosure pursuant to the Federal Truth in Lending Act ("TILA"), *id.* at 6–7; (4) the Agreement itself, *id.* at 8–21; (5) a notice of the right to cancel the loan, *id.* at 22–23; (6) an authorization for automatic direct payment, *id.* at 24–25; (7) a disclosure as to how Solar Mosaic handles customers' information, *id.* at 26–28; and (8) a consent to electronic receipt of consumer disclosures, *id.* at 30–32. At the end of documents (1), (2), (3), (4), and (6) appears the name "Danielle Garcia," an electronic signature in the initials of that name under "DocuSigned by," and the date 6/2/2021. *See id.* at 4–5, 7, 21, 25. The DocuSign "certificate of completion" produced by Solar Mosaic contains three timestamps: "Sent: 6/2/2021 2:41:18 PM," "Viewed: 6/2/2021 2:41:29 PM," and "Signed: 6/2/2021 2:41:52 PM." *See id.* at 29. It contains the following notations: "Signatures: 6" and "Signature Adoption: Drawn on Device." *Id.*

The Agreement describes Solar Mosaic as the lender, Ms. Garcia as the borrower, and Solar Program as the "Installation Contractor." *Id.* at 8; FAC ¶ 52. It provides for an $82,000 loan and sets out a three-stage payment plan: 16 monthly payments of $367.48, followed by 281 monthly payments of $496, and, finally, a payment of $491.57. Dkt. 18-1 at 8; FAC ¶ 52. Likewise, the TILA disclosure sets out an "Amount Financed" of $82,000, due to Solar Program.

6

Dkt. 18-1 at 6–7.  It states that "[t]he installation contractor may provide us a fee or discount against the Amount Financed noted herein," but that the "Amount Financed shown is not reduced by any such fee or discount," and that the signatory "remain[s] contractually bound to repay the full Amount Financed."  *Id.* at 7; FAC ¶ 58.  Neither the Agreement nor the TILA disclosure mention the Welcome Checks.  *See* Dkt. 18-1 at 6–21; FAC ¶ 55.  The Garcias contend that the "deliberate non-disclosure" in these documents of any discount suggests that Group Solar and Solar Mosaic had arranged "to conceal the actual cost of the solar panel system for their shared economic benefit."  FAC ¶ 59.  They allege that the payments made under the Agreement "were delivered from Solar Mosaic to Group Solar directly."  *Id.*

Section 16 of the Agreement (the "arbitration provision"), titled "Arbitration Agreement," states:

> **PLEASE READ THE FOLLOWING ARBITRATION TERMS CAREFULLY AS THEY WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL CLAIMS YOU AND WE HAVE AGAINST EACH OTHER ARE RESOLVED.** If either you or we elect to arbitrate a Claim rather than have a court (a judge or a jury) decide the Claim, it will be resolved by individual (not class or class-wide) binding arbitration in accordance with the terms specified in this Arbitration Agreement.

Dkt. 18-1 at 18 (emphasis in original).  The arbitration provision states that the terms "we," "us," and "our" in the provision refer to, *inter alia*, Solar Mosaic, its assignees, its successors, and "third parties if you assert a Claim against such third parties in connection with a claim you assert against us."  *Id.*  The provision defines "Claim" as follows:

> A "Claim" is any claim, dispute or controversy between you and us, whether preexisting, present or future, which arises out of or relates to the Loan Agreement, any prior agreement you have had with us, the events leading up to your loan (for example, any disclosures, advertisements, promotions or oral or written statements made by us), any product or service provided by us or third parties in connection with your loan, any transaction conducted with us, the collection of amounts you owe us and the manner of collection or the relationship between you and us.

7

> The term "Claim" has the broadest possible meaning. It includes initial claims, counterclaims, cross-claims, third-party claims and federal, state, local and administrative claims and claims which arose before the effective date of this Arbitration Agreement. It also includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, regulation, ordinance, common law and equity and claims for money damages and injunctive or declaratory relief.

*Id.* The arbitration provision states that the term "Claim" does not encompass, however, "any dispute or controversy about the validity, enforceability, coverage or scope of this Arbitration Agreement or any part thereof (including, without limitation the Class Action Waiver set forth below and/or this sentence)." *Id.* The provision further states that "the interpretation and enforcement of this Arbitration Agreement and proceedings pursuant thereto" are governed by the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1 *et seq. Id.* at 19. The Agreement contains a class action waiver.[6]

The provision permits rejection of the arbitration provision only through written notice sent to Solar Mosaic within 45 days of the Agreement's effective date. *Id.* at 20–21; *see also id.* at 18. At the end of the provision is a line that states, "Arbitration Agreement Accepted and agreed to by," the word "Borrower," and a DocuSign signature similar to the other signatures in the Documents. *Id.* at 21. Neither party states that the Garcias filed a rejection notice.

### 4.    Performance of the Solar Panels

In September 2021, the Garcias' solar panels were installed. FAC ¶ 66. On October 5, 2021, Solar Mosaic sent the first payment statement. *Id.* ¶ 67.

Following the installation, the Garcias did not observe any change in their electric bill. *Id.* ¶ 66; *see also* Ms. Garcia Decl. ¶ 15; Mr. Garcia Decl. ¶ 11. Given their concerns that the

---

[6] It states, *inter alia*, "if either you or we elect to arbitrate a Claim, neither you nor we will have the right: (a) to participate in a class action . . . either as a class representative or class member; or (b) to join or consolidate Claims with claims of any other persons." Dkt. 18-1 at 19 (emphasis omitted).

panels were not generating, and had never generated, power, the Garcias contacted ConEdison, their service provider.  FAC ¶ 68.  The Garcias confirmed with ConEdison that the panels were not producing energy and discovered that the panels and/or their installation were "defective." *Id.* ¶ 69; *see also* Ms. Garcia Decl. ¶ 16; Mr. Garcia Decl. ¶ 13.

After multiple attempts to contact Group Solar, the Garcias spoke to a representative, who told them that a technician would fix the problem.  FAC ¶ 70.  Between October 2021 and April 2022, Group Solar sent multiple technicians to work on the panels.  *Id.* ¶ 71.  These visits caused "significant inconveniences," including with respect to the Garcias' work schedules, as one of them had to stay home from work in order to permit the technicians to access the circuit breakers in the house.  *Id.* ¶¶ 72–73.  At each inspection, the Garcias "were assured that it would be the last visit and the issue with the panels was resolved."  *Id.* ¶ 74.  However, none of the technicians was able to fix the panels.  *Id.* ¶ 71.  The Garcias notified Solar Mosaic of the non-working panels multiple times; each time, Solar Mosaic told them that issues with panel operations must be directed to Group Solar.  *Id.* ¶ 77.  Group Solar "never" responded to the Garcias' calls or answered their questions about why the panels did not work.  *Id.* ¶ 84.

At some point in June 2022, the solar panels began generating energy.  *Id.* ¶ 75.  The Garcias state that the panel began working only as a result of Mr. Garcia's "research and labor." *Id.* ¶ 78.  After that point, the Garcias' electric bill increased.  *Id.* ¶ 75.  All the while, the Garcias were charged $367.48 per month by Solar Mosaic for the panels, plus $315 per month by ConEdison for their electric bill.  *Id.* ¶ 76.  The Garcias continued to pay their loan from Solar Mosaic "to avoid potential negative reporting on Mrs. Garcia's credit reports."  *Id.* ¶ 85.  The FAC alleges that the loan imposed a "major financial strain" on the Garcias, and their timely

loan payments to Solar Mosaic, combined with payment of "an energy bill they did not expect or budget to have to pay," caused them to make late payments on other bills. *Id.* ¶¶ 86–87.

The Garcias received two checks: one for $2,400 and one for $1,600—less than the $6,606 that they expected.[7] *Id.* ¶ 80.  During their calls regarding the panels, the Garcias notified Group Solar that they had not received the third Welcome Check. *Id.* ¶ 82.  Group Solar "repeatedly promised" that the missing check would be sent to the Garcias, but they did not receive any such check. *Id.* ¶ 83.

The Garcias bring claims—on their behalf and on behalf of a putative class—of deceptive business practices, false advertising, breach of contract, violation of the Retail Installment Sales Act, and unjust enrichment; and individual claims of, *inter alia*, breach of the implied warranty of merchantability under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, false advertising, breach of contract, negligent hiring and supervision, unjust enrichment, and breach of express warranty. *Id.* ¶¶ 149–207, 215–42, 250–57.  The damages they seek include recovery of the undelivered Welcome Checks. *Id.* ¶ 56.

### B.     Procedural History

On December 22, 2022, plaintiffs filed the Complaint.  Dkt. 1.  Between January 11 and 31, 2023, plaintiffs served defendants. *See* Dkts. 11–14.  On February 1, 2023, Solar Mosaic filed the instant motion to compel arbitration of the Garcias' claims against it, along with a memorandum of law and declaration in support.  Dkts. 16, 17 ("Mot."), 18 ("Rothenberg Decl.").  The same day, Solar Mosaic moved to dismiss the claims against it and strike the Garcias' class allegations.  Dkts. 19–20.  On February 2, 2022, the Court ordered that the Garcias file a

---

[7] The FAC and the Garcias' declarations state that they received a total of $4,200 in checks. *See* FAC ¶ 80; Ms. Garcia Decl. ¶ 20; Mr. Garcia Decl. ¶ 16.  However, the FAC provides individual check amounts of $2,400 and $1,600, which total $4,000. *See* FAC ¶ 80.

response to the motion to compel arbitration by February 22, 2023 and either oppose the motion

to dismiss or amend their complaint by February 22, 2023. Dkt. 23.

On February 17, 2023, the Garcias requested an extension of time to amend their

complaint, which the Court granted. Dkts. 24–25. On March 24, 2023, they filed the FAC. Dkt.

36. On March 28, 2023, Solar Mosaic notified the Court that the Garcias had not opposed its

motion to compel arbitration. Dkt. 37. On March 29, 2023, the Garcias filed a letter stating that

they wished to oppose that motion. Dkt. 38. On April 3, 2023, the Court, noting that Solar

Mosaic had stated that the filing of the FAC did not affect its motion to compel arbitration,

directed that the Garcias oppose the motion by April 14, 2023. Dkt. 39.

On April 14, 2023, the Garcias opposed the motion to compel arbitration, filing

declarations of Ms. Garcia and Mr. Garcia. Dkt. 44 ("Opp."). The same day, Solar Mosaic filed

its renewed motion to dismiss the FAC and strike the Garcias' class allegations. Dkts. 42–43.

On April 28, 2023, Solar Mosaic filed its reply as to the pending motion to compel arbitration.

Dkt. 50 ("Reply"). On May 15, 2023, the Garcias opposed Solar Mosaic's motion to dismiss.

Dkt. 55. On May 24, 2023, Solar Mosaic filed its reply to the motion to dismiss. Dkt. 60.

Group Solar and Solar Program have not answered or otherwise appeared in this case.[8]

## II.     Applicable Legal Principles

The FAA provides that an arbitration agreement "shall be valid, irrevocable, and

enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract." 9 U.S.C. § 2. The FAA "creates a body of federal substantive law establishing and

regulating the duty to honor an agreement to arbitrate." *Mitsubishi Motors Corp. v. Soler*

---

[8] Salal, on April 21, 2023, moved to compel arbitration or, in the alternative, dismiss the claims
against it in the FAC. Dkts. 45–47. On June 2, 2023, plaintiffs opposed Salal's motion. Dkt.
62. On June 30, 2023, Salal replied. Dkts. 71–72.

*Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).  Congress enacted the FAA to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footing as other contracts." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11 (1974) (citation omitted).

"The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (alteration and citation omitted).  "In deciding whether to compel arbitration, a court must first decide whether the parties agreed to arbitrate." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022).  "Only if the court concludes an agreement to arbitrate exists does it determine (1) the scope of the agreement to arbitrate; (2) whether Congress intended any federal statutory claims asserted to be non-arbitrable; and (3) if some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration." *Id.*; *see also Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008).

On a motion to compel arbitration, "courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 175 (2d Cir. 2003)).  Courts thus "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and "draw all reasonable inferences in favor of the non-moving party." *Id.* (citation omitted).  "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the

need for further court proceedings." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (citation omitted).  Where, however, "there is a disputed question of material fact," *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 49 (2d Cir. 2022), "the court shall proceed summarily to the trial thereof," 9 U.S.C. § 4.

The party moving to compel arbitration "must make a *prima facie* initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order).  The moving party need not "show initially that the agreement would be *enforceable*, merely that one existed." *Id.* (emphasis in original).  Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)).

## III.   Discussion

Solar Mosaic moves to compel arbitration of the Garcias' claims, and, separately, to dismiss the Garcias' claims against it. *See* Mot.; Dkt. 43.  It argues that Ms. Garcia is bound by the arbitration provision through her signature on the Agreement, and that Mr. Garcia is bound because, *inter alia*, he directly benefited from the Agreement. Mot. at 1.  The Garcias oppose both motions. Opp.; Dkt. 55.

For the following reasons, the Court grants the motion to compel arbitration as to the Garcias' claims; stays the Garcias' claims against Solar Mosaic, Group Solar, and Solar Program; and, without prejudice, denies Solar Mosaic's motion to dismiss.

### A.   Motion to Compel Arbitration

Based on its submissions in support of the motion to compel, including the Agreement itself, Solar Mosaic has made a *prima facie* showing that an agreement to arbitrate existed.  And

the Garcias do not dispute that the Agreement contains a provision committing its signatories to arbitration or that Ms. Garcia signed the Agreement. *See* FAC ¶¶ 48–51; Opp. at 7–9. The Court accordingly must resolve two questions as to the threshold issue of whether there was an enforceable agreement to arbitrate: First, have the Garcias met their burden to prove that the arbitration provision was "inapplicable or invalid" so as not to bind Ms. Garcia? *Harrington*, 602 F.3d at 124. And second, if the arbitration provision binds Ms. Garcia as a signatory, does it also bind Mr. Garcia, a non-signatory? Assuming these thresholds are cleared, the Court then considers whether the particular claims brought in this litigation fall within the scope of the arbitration agreement. As to that point, the parties agree that, under the Agreement, that question is for the Court, as opposed to an arbitrator, to decide. *See* Dkt. 18-1 at 18 (stating that "Claim" does not include disputes as to "validity, enforceability, coverage or scope" of arbitration provision); *see also* Opp. at 4–5; *Howsam*, 537 U.S. at 83.

### 1. Did the Parties Agree to Arbitrate?

#### a. *Whether the Arbitration Provision Binds Ms. Garcia*

"We resolve . . . agreement-formation questions as we would most any contract dispute: by applying the law of the state at issue." *Barrows*, 36 F.4th at 50. Here, New York law applies. *See* Dkt. 18-1 at 17 (Agreement governed by federal law and the "laws of the state where the Residence is located"); *id.* at 19 (arbitration provision governed by "the Residence state law"); Opp. at 5–6 (agreeing that New York law applies). Under New York law, a person "who signs or accepts a written contract is conclusively presumed to know its contents and to assent to them." *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (citation and alteration omitted) (citing *Metzger v. Aetna Ins. Co.*, 227 N.Y. 411, 416 (1920)). "[A] party is under an obligation to read a document before he or she signs it, and a party cannot generally avoid the effect of a [document] on the ground that he or she did not read it or know its

14

contents." *Marciano v. DCH Auto Grp.*, 14 F. Supp. 3d 322, 330 (S.D.N.Y. 2014); *see, e.g.*, *Crewe v. Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 74 (S.D.N.Y. 2012).

"It is a basic tenet of contract law that, in order to be binding, a contract requires a meeting of the minds and a manifestation of mutual assent." *Starke v. SquareTrade Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) (citation omitted). "Where an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Id.* at 289 (emphasis in original). "In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention," a question that "often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way." *Id.*

These same contract law principles apply to online transactions. *Id.* (citing *Resorb Networks, Inc. v. YouNow.com*, 30 N.Y.S.3d 506, 511 (N.Y. Sup. Ct. 2016)). "Courts around the country have recognized that an electronic click can suffice to signify the acceptance of a contract, and that there is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (alterations and citation omitted). As to digital contracts, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms." *Zachman*, 49 F.4th at 102 (citation and brackets omitted).

This case involves an agreement made in a hybrid analog-digital setting: Ms. Garcia signed the Agreement on an iPad through the DocuSign website, but in the presence of a representative of the other party to the contract. Because the evidence does not establish that the

Garcias had actual notice of the arbitration provision, *see* Ms. Garcia Decl. ¶ 12; Mr. Garcia

Decl. ¶ 8, the Court's analysis hinges on whether they had constructive, or inquiry, notice of it.

Solar Mosaic argues that the Garcias had such notice and thus a duty to read the Agreement.

Reply at 2–4, 6–7. The Garcias counter that the Agreement's terms were not explained or shown

to them, and that they were not "given an opportunity to review the documents or permitted to

scroll through the documents on the iPad." FAC ¶ 60; *see* Ms. Garcia Decl. ¶¶ 7, 12, 23; Mr.

Garcia Decl. ¶ 8. On this ground, they argue, they lacked inquiry notice of the arbitration

provision. *See* Opp. at 7–9.

Solar Mosaic easily has the better of this argument. The Agreement here is most akin to

a "clickwrap" agreement, in which "a user must click 'I agree,' but not necessarily view the

contract to which she is assenting." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394–95

(E.D.N.Y. 2015). Courts "scrutinize the circumstances surrounding an alleged assent to a

clickwrap agreement," but they "have generally found clickwrap agreements enforceable

because '[b]y requiring a physical manifestation of assent, a user is said to be put on inquiry

notice of the terms assented to.'" *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 465 (S.D.N.Y.

2017) (quoting *Berkson*, 97 F. Supp. 3d at 397); *see also Zachman*, 49 F.4th at 103 (noting

Second Circuit has "consistently upheld" "clickwrap" agreements).

Here, it is undisputed that Ms. Garcia signed the Agreement after (1) a representative

made a proposal to the Garcias regarding solar panel financing and installation, FAC ¶ 40;

(2) the Garcias "decided to move forward with the purchase and installation," *id.* ¶ 45; and (3) a

representative later visited her home to obtain her signature with respect to the financing and

installation, *id.* ¶ 48.

Under such circumstances, given the "transactional context of the parties' dealings," any reasonable person in Ms. Garcia's situation would presume that this third step of the process "clearly contemplated some sort of continuing relationship between the putative user and [Solar Mosaic], one that would require some terms and conditions." *Meyer*, 868 F.3d at 80. That reasonable person "would understand" that her signature on the iPad "constitute[s] assent" to those terms and conditions, even if she did not read the terms. *Starke*, 913 F.3d at 289; *see, e.g.*, *Meyer*, 868 F.3d at 79–80 ("A reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not."); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 552 (S.D.N.Y. 2018) (courts are "more willing to find the requisite notice for constructive assent where . . . the user is required to affirmatively acknowledge the agreement" (citation omitted)).

That no one purportedly explained or showed the contents of the terms and conditions to Ms. Garcia does not preclude a finding that she had reasonable notice of the *existence* of those terms and conditions—and, therefore, the duty to inquire about those terms if she wished. *Cf. Meyer*, 868 F.3d at 78 (finding customer to be on reasonable notice of terms of service even though such terms "were available only by hyperlink"); *Middleton v. T-Mobile US, Inc.*, No. 20 Civ. 3276 (NGG) (JRC), 2022 WL 16828226, at *6–8 (E.D.N.Y. Aug. 24, 2022) (upholding arbitration provision where, *inter alia*, plaintiff signed contract on in-store display that allegedly did not permit full review of document but did not claim he "was unaware of the terms' existence"). And "'[a] signer's duty to read and understand that which it signed is not diminished merely because the signer was provided with only a signature page.'" *Marciano*, 14 F. Supp. 3d at 330 (alteration omitted) (quoting *Dasz, Inc. v. Meritocracy Ventures, Ltd.*, 969 N.Y.S.2d 653, 655 (2013)).

That Ms. Garcia signed the Agreement in the presence of a Solar Mosaic representative reinforces the Court's conclusion. Unlike parties to one-way, online transactions, the Garcias had the opportunity to directly engage with a representative of the other contracting party to ask about the Agreement—yet, by their own account, did not do so. Although the FAC states that the Garcias were not affirmatively "given an opportunity to review the documents or permitted to scroll through the documents on the iPad," FAC ¶ 60, there is no indication that they requested or attempted to review the terms, let alone that such requests were denied. Their "actions and inaction on the day of purchase constitute admissions sufficient to show that [s]he chose to sign the contract . . . without reading it." *Bayron-Paz v. Wells Fargo Bank, N.A.*, No. 22 Civ. 6122 (DLC), 2023 WL 4399041, at *4 (S.D.N.Y. July 7, 2023) (compelling arbitration where plaintiff alleged salesperson obtained signature on agreement through iPad and did not explain agreement terms, as plaintiff "knew that the transaction would be governed by a written agreement . . . but chose to sign the iPad twice without requesting that its contents be displayed to him").

Salient too, the Garcias—who bear the burden of showing that the executed agreement is not enforceable—have not come forward with evidence suggesting that the salesperson hurried, coerced, defrauded, or otherwise misled Ms. Garcia into signing the Agreement so as to render the arbitration provision unenforceable. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991) (upholding decision to compel arbitration given the absence of evidence that plaintiff "was coerced or defrauded into agreeing to the arbitration clause"); 9 U.S.C. § 2. *Contra, e.g., Applebaum*, 263 F. Supp. 3d at 466–67 (finding that registration process did not put plaintiff on inquiry notice of terms where defendant's clickwrap agreement "did not alert reasonable consumers to the gravity of the 'clicks,'" and where the terms screen was "misleading" and "structured as part of a process to verify a phone number, not to enter a

18

detailed contractual agreement"). The Garcias vaguely state that they were "induce[d]" into the Agreement. *See, e.g.*, FAC ¶¶ 1–2; Opp. at 10 (arguing representative "essentially conceal[ed] mandatory disclosures"). But their declarations, which are the only evidence they present in opposing the motion to compel, do not back up this conclusory claim. They do not suggest that the representative who obtained Ms. Garcia's signature actively misled them as to the terms of the Agreement or guaranteed the incorporation of the Welcome Checks into the Agreement. The Garcias likewise do not suggest that the arbitration provision was improperly "temporally and spatially" detached from the broader financing transaction. *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 127 (2d Cir. 2012) (affirming denial of motion to compel where arbitration provision was "temporally and spatially decoupled" from enrollment in program). The Garcias thus have failed to create a material factual dispute as to whether they were on notice of the existence of terms of the Agreement, and thus have not met their burden of "showing the agreement to be inapplicable or invalid," *Harrington*, 602 F.3d at 124.

To be sure, the record is not as detailed as it might have been as to the conversation between the representative and the Garcias surrounding the signing of the Agreement and the mechanics of the DocuSign website. But the record supplies an ample basis on which to find that Ms. Garcia reasonably should have known that she was entering into an agreement with terms and conditions and that the signature that she admits supplying in the rectangular box would constitute "a physical manifestation of assent" to those terms. *Applebaum*, 263 F. Supp. 3d at 465 (citation omitted). And the burden to show invalidity falls on the Garcias. Because Ms. Garcia should have reasonably known that by signing she was entering into a contract, she cannot "avoid the effect" of the Agreement by asserting no more than that "she did not read it."

*Marciano*, 14 F. Supp. 3d at 330.  The contrary holding would reward customers for their deliberate ignorance as to the provisions of contracts they knowingly executed.

The cases in which the Second Circuit has found insufficient basis to compel arbitration based on arbitration provisions in electronic contracts are inapposite.  Most involved digital contracts signed in different settings—through a website or mobile application accessed on a personal device, without a representative of the other party present.  These decisions turned on the lack of visibility of the operative arbitration terms.[9]  In the Garcias' case, the visibility of the terms is not at issue.  Under the circumstances under which Ms. Garcia signed the Agreement, any reasonable person would have notice of the *existence* of contractual terms to which she was binding herself.  Such notice is sufficient to render the arbitration provision binding, regardless of the immediate visibility of its terms.  Had the Garcias so much as reviewed the Agreement, they would have discovered the arbitration provision, which is characterized by bold-face type, contained in a section prominently titled "Arbitration Agreement," and which makes up fully four pages of the 14-page Agreement.  *See* Dkt. 18-1 at 8–21.

For this reason, *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002), on which the Garcias rely, *see* Opp. at 8–9, is also inapposite.  There, the Second Circuit affirmed the denial of a motion to compel arbitration where plaintiffs had been "invited by

---

[9] *See, e.g., Zachman*, 49 F.4th at 103 (remanding for further factfinding as to arbitration provision in amended internet banking agreement where defendant "did not submit evidence of how the . . . [a]greement was presented to users" and district court thus could not "assess whether the relevant language and hyperlink are clear and conspicuous" (citation omitted)); *Starke*, 913 F.3d at 292–94 (affirming denial of motion to compel based on agreement emailed after online transaction where "'Terms & Conditions' hyperlink was neither spatially nor temporally coupled with the transaction," and email was "cluttered with diverse text" and "displayed in multiple colors" and "in no way signals to [customer] that he should click on the link"); *Nicosia*, 834 F.3d at 236–37 (finding "reasonable minds could disagree" as to whether plaintiff lacked constructive notice where arbitration provision was accessible only through a hyperlink on page with multiple hyperlinks, buttons, and advertisements).

defendants to download [a] fast, free plug-in called SmartDownload," and could see only "a screen containing praise for the product and, at the very bottom of the screen, a 'Download' button," with the "notice of the existence of [the] license terms . . . on the next scrollable screen." *Id.* at 30–32. In finding that a reasonable consumer lacked inquiry notice of the terms at issue, the Circuit noted that "[p]laintiffs were responding to an offer that did not carry an immediately visible notice of the existence of license terms," and that the website at issue was "printed in such a manner that it tended to conceal the fact that it was an express acceptance of [Netscape's] rules and regulations." *Id.* at 31–32 (citation omitted). Here, the Garcias have not mustered any evidence of anything done to obscure the facts that Ms. Garcia was signing a contract or that the contract contained terms. The Garcias claim only that they were not "given an opportunity to review the documents" and "were unaware of the terms contained therein." FAC ¶ 60. But, as the *Specht* Court reaffirmed, "a party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing." *Specht*, 306 F.3d at 30 (citation and alteration omitted).

The Garcias' other counterarguments fail. They argue that an authorization within the Documents "intended for the Group Solar/Solar Mosaic representative to act as its agent and to provide actual assistance to the Plaintiffs in the signing process," that the representative failed to do so, and that this failure voids the arbitration provision. Opp. at 9. But the authorization they cite does not affirmatively oblige the representative to explain provisions of the Agreement. It states that the borrower "authorize[s] the installation contractor including its employees and third party service providers (collectively the '*Installation Contractor*'), to assist me in completing and submitting my application to Mosaic." Dkt. 18-1 at 5. And the Agreement defines Solar Program, not Solar Mosaic, as the "Installation Contractor." *Id.* at 8. The authorization thus is read simply to empower the installation contractor to assist the customer in the completion and

submission of the agreement.  Even if this provision were read not merely to authorize such assistance, but to require the furnishing of it upon request, the Garcias do not allege that they ever requested such help, from Solar Program or Solar Mosaic, let alone that it was delayed.

The Garcias also note that Ms. Garcia's signature at "several locations" within the Documents appears identical.  Opp. at 10.  The Garcias' implication is that, after Ms. Garcia electronically signed within the rectangular signature box using the DocuSign technology, this signature was then used to populate the signature lines in all other provisions requiring a signature, including the arbitration provision, rather than Ms. Garcia's originally signing her signature each time.  The DocuSign timestamps indicate that the Documents were "sent," "viewed," and "signed" within one minute.  *See* Dkt. 18-1 at 29.  Although the ensuing five applications of Ms. Garcia's compact signature could have been personally signed within that time frame, such is also consistent with the Garcias' theory that the signature given by Ms. Garcia at the outset was later applied to the ensuing signature spaces within the Documents, based on a clicked indication of assent characteristic of the DocuSign technology.

Without more, there is nothing about these facts that requires invalidating the Agreement. These facts are easily squared with the facts conceded by Ms. Garcia: that she willingly signed once within a rectangular box, signifying her assent, and did not read the balance of the contract documents.  Under these circumstances, the natural inference is that, either automatically or by Ms. Garcia individually clicking through the remaining spaces, her signature was electronically applied to the signature boxes in the Documents.  Although Ms. Garcia does not allege this, it is also theoretically possible that another person, perhaps the representative present in her home or perhaps her husband, did so, supplying the click-approvals that caused her signature to be electronically entered in the remaining spaces.  Regardless of the mechanics by which the

22

signature she supplied was entered in the ensuing signature spaces, Ms. Garcia, critically, does

not contend that the electronically entered signatures that follow her first signature were input

against her will.[10]  In these circumstances, having had an opportunity to review the Documents

and having admittedly signed in the rectangular box so as to convey her consent, Ms. Garcia was

on notice of the balance of the Documents, including the required spaces for her signature.  Thus,

whether her signature was entered in those later places by Ms. Garcia's personally clicking each

time to authorize the placement of her electronic signature in the later signature spaces, or by or

another person's doing so on her behalf, or by an automated process, she "assent[ed] to them

through conduct that a reasonable person would understand to constitute assent," *Starke*, 913

F.3d at 289.  And Ms. Garcia does not anywhere contend that she was misled to believe that

there was only one line for her signature, or denied an opportunity to review the full suite of

Documents and the signatures spaces therein.  That her electronic signature was quickly inputted

across the Documents is, without more, insufficient to give rise to a need for an evidentiary

hearing to resolve the issue of her assent.

The Court thus finds, as a matter of law, that Ms. Garcia agreed to arbitrate with Solar

Mosaic through her signature on the Agreement.

b.    *Whether the Arbitration Provision Binds Mr. Garcia*

The Court next considers whether the arbitration provision extends to Mr. Garcia, a non-

signatory to the Agreement.  "Arbitration is a creature of contract; a party therefore cannot be

required to submit to arbitration any dispute which it has not agreed to submit." *Doe v. Trump

Corp.*, 6 F.4th 400, 412 (2d Cir. 2021).  Still, "it is *not* the case that an obligation to arbitrate

---

[10] Plaintiffs originally alleged that Ms. Garcia was not present when the Agreement was signed, and that Mr. Garcia signed on her behalf. *See supra* note 5; FAC ¶ 45.  Only in the FAC did Ms. Garcia admit that she had signed the Agreement.

attaches only to one who has personally signed the written arbitration provision." *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 71 (2d Cir. 2005) (citation omitted).  The Second Circuit has recognized multiple principles of contract law "under which a non-signatory may be compelled to arbitrate a claim with a signatory to an agreement containing an arbitration clause." *Id.*  These include: "(1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter-ego, and (5) estoppel." *Id.*; *see, e.g.*, *Serv. Emps. Int'l Union, Loc. 32BJ v. Stone Park Assocs., LLC*, 326 F. Supp. 2d 550, 554 (S.D.N.Y. 2004).  "[W]hether nonsignatories to an arbitration agreement may nevertheless be bound by the agreement is often fact specific and differ[s] with the circumstances of each case." *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd.*, 954 F.3d 567, 570 (2d Cir. 2020) (citation omitted).

Here, Solar Mosaic asserts that Mr. Garcia is bound by the arbitration through theories of agency and estoppel.  Mot. at 9–10.  The Garcias do not appear to counter these arguments.

Under the "direct benefits theory of estoppel," an entity "knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement." *Trina Solar US*, 954 F.3d at 572 (citation omitted).  "Under New York law, the guiding principle of the theory is whether the benefit gained by the nonsignatory is one that can be traced directly to the agreement containing the arbitration clause." *Id.* (citation omitted).  "The benefits must be direct—which is to say, flowing directly from the agreement." *Boroditskiy v. Eur. Specialties LLC*, 314 F. Supp. 3d 487, 495 (S.D.N.Y. 2018) (quoting *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001)).  "[T]he mere fact of a nonsignatory's affiliation with a signatory will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is." *Gater Assets Ltd.*

*v. AO Moldovagaz*, 2 F.4th 42, 68 (2d Cir. 2021) (citation omitted).[11] "Examples of direct

benefits serving as the basis for estoppel have included, for example, (1) the right of a foreign

affiliate to use the 'Deloitte' trade name, arising from an agreement . . . which expressly

conferred the trade name right on the affiliate," and "(2) the right of a vessel owner, which had

commissioned a custom racing sailboat, to take advantage of lower maritime insurance rates and

to register a vessel under a particular flag." *Id.* at 68–69 (citations omitted).

      Here, Mr. Garcia received direct benefits from the Agreement, permitting Solar Mosaic

to estop him from avoiding arbitration of his claims, which parallel his wife's claims against

Solar Mosaic.  The Agreement states that the parties to the contract are Ms. Garcia, as borrower,

and her "permitted assignees," and Solar Mosaic, as lender, and its, *inter alia*, assignees and

successors. Dkt. 18-1 at 12; *see also id.* at 17 (stating borrower's obligations apply to her "heirs,

personal representatives and permitted assigns").  But although the Agreement does not make

Mr. Garcia a party, the evidence establishes that he received benefits "that can be traced

directly," *Trina Solar*, 954 F.3d at 572, to the Agreement—namely, the installation of the solar

panels at his residence and the loan enabling the purchase of those panels.  *See, e.g.*, *In re A2P

SMS Antitr. Litig.*, 972 F. Supp. 2d 465, 491–92 (S.D.N.Y. 2013) (compelling arbitration of

nonsignatory's claim where nonsignatory enjoyed messaging benefits that would not have

existed "[b]ut for" contract); *Lakah v. UBS AG*, 07 Civ. 2799 (LAP), 2017 WL 7245365, at *94

---

[11] Some cases have presented the opposite fact pattern from this: where a nonsignatory seeks to
compel a signatory to arbitrate claims.  Courts may "estop a *signatory* from avoiding arbitration
with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are
intertwined with the agreement that the estopped party has signed, and the signatory and
nonsignatory parties share a close relationship." *MAG Portfolio*, 268 F.3d at 62 (citation
omitted). "However, because arbitration is guided by contract principles, the reverse is not also
true: a signatory may not estop a nonsignatory from avoiding arbitration regardless of how
closely affiliated that nonsignatory is with another signing party." *Id.*; *see also Thomson-CSF,
S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995).

(S.D.N.Y. Feb. 14, 2017) (non-signatory can be estopped from avoiding arbitration where they "reap[ed] a direct benefit made possible by the agreement"). Consistent with this, the FAC and Mr. Garcia's declaration indicate that the Garcias, acting together, notified Solar Mosaic of the deficiencies with the panels. *See* FAC ¶ 77; Mr. Garcia Decl. ¶ 15. Mr. Garcia thereby "invoke[d] [Solar Mosaic's] duties under the [Agreement] to seek or obtain a benefit." *See Trina Solar US*, 954 F.3d at 573. Under these circumstances, the Court finds that the Agreement's arbitration clause extends to Mr. Garcia's claims against Solar Mosaic by virtue of the direct benefits he received from the Agreement.[12]

Accordingly, the Court finds that, as a matter of law, the Garcias entered an agreement to arbitrate with Solar Mosaic, which may be enforced against Ms. Garcia as a signatory and against Mr. Garcia as a direct beneficiary. Because Mr. Garcia is bound by the arbitration provision pursuant to an estoppel theory, the Court does not have occasion to consider Solar Mosaic's alternative argument that he is bound based on agency principles.

### 2.    Do the Garcias' Claims Fall Under the Arbitration Clause?

Solar Mosaic next argues that the Garcias' claims in this litigation fall within the scope of the arbitration provision. *See* Mot. at 7–9. That is clearly correct.

The Garcias bring claims on behalf of a putative class of deceptive business practices, false advertising, breach of contract, violation of the Retail Installment Sales Act, and unjust

---

[12] Mr. Garcia's receipt of direct, tangible benefits from the Agreement distinguishes this case from those in which courts have denied estoppel arguments. *See, e.g.*, *Gater Assets Ltd.*, 2 F.4th at 69 (finding no direct benefits to nonsignatory where, *inter alia*, "specific purchase terms and even the consummation" of the agreement "were not necessary" to confer benefits, and record did not indicate that nonsignatory actually invoked agreement "to obtain any benefit"); *Boroditskiy*, 314 F. Supp. 3d at 496 (denying motion to compel arbitration of nonsignatory's claims where benefits received "[we]re not contemplated by the Agreement and thus are indirect"); *Specht*, 306 F.3d at 39 (finding no direct benefits where non-signatory received only "abstract advantage" through contract's facilitation of visits to its website).

enrichment; and claims on individual bases of, *inter alia*, breach of the implied warranty of

merchantability under 15 U.S.C. § 2301, *et seq.*, false advertising, breach of contract, negligent

hiring and supervision, unjust enrichment, and breach of express warranty. FAC ¶¶ 149–207,

215–42, 250–57. The factual basis for these claims are the alleged deficiencies in the solar

panels and the alleged failure to deliver Welcome Checks. These claims fit well within the

operative arbitration provision, which compels arbitration of "any claim, dispute or controversy

between you and us," including those based on "promotions or oral or written statements," and

"any product or service provided by us or third parties in connection with your loan." Dkt. 18-1

at 18. The Garcias do not overtly dispute this point. Nor has either party identified any federal

claim that Congress intended be unarbitrable. *See, e.g., Bayron-Paz*, 2023 WL 4399041, at *5

(compelling arbitration of Magnuson-Moss Warranty Act claims); *Haythe v. Samsung Elecs.

Am., Inc.*, No. 22 Civ. 3509 (VEC), 2023 WL 4187562, at *4 (S.D.N.Y. June 26, 2023) (same).

Therefore, the Court compels arbitration of all of the Garcias' claims against Solar Mosaic.

### 3.    Which Claims Should Be Stayed Pending Arbitration?

Solar Mosaic asks that the Court stay the Garcias' claims not only against it, but also

against Group Solar and Solar Program pending arbitration of their claims with Solar Mosaic.

Mot. at 11. It explains that the arbitration of the claims against Solar Mosaic "will require a

determination of whether [Solar] Mosaic is subject to derivative liability" based on Group Solar

and Solar Program's alleged conduct. *Id.* at 12. A stay of claims against all three entities would

thus, it argues, conserve judicial and party resources and avoid inconsistent rulings as to Group

Solar and Solar Program's liability. *See id.* at 12–14. The Garcias do not appear to oppose a

stay of this scope.

The Second Circuit has held that "the text, structure, and underlying policy of the FAA

mandate a stay of proceedings when all of the claims in an action have been referred to

arbitration and a stay requested." *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015). A

stay as to all claims brought against Solar Mosaic is thus required. The Court is persuaded,

given the theories of derivative liability pursued here against Solar Mosaic, that this stay should

extend to the Garcias' claims against Group Solar and Solar Program. *See, e.g., Mobile Real

Estate, LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 481 (S.D.N.Y. 2020) (finding

discretionary stay of action warranted where "significant factual overlap" between claims). A

stay of this scope will expedite this case by enabling the prompt arbitral resolution of the claims

against Solar Mosaic and deferring appellate review until after the arbitration has concluded.

The Court does not stay the other claims in this case. Subject to resolution of Salal's separate

motion to compel arbitration, the other claims in this case are to proceed in this Court until

resolution or dismissal.

    **B.**    **Motion to Dismiss**

    In light of the rulings above, the Court denies without prejudice Solar Mosaic's motion to

dismiss the Garcias' claims against it. *See, e.g., Saleh v. Digital Realty Tr., Inc.*, No. 21 Civ.

9005 (PAE), 2022 WL 3139733, at *9 (S.D.N.Y. Aug. 5, 2022) (denying motion to dismiss

claims where Court granted motion to compel arbitration of those claims). Any such motion is

to be directed to the arbitrator.

**CONCLUSION**

    For the foregoing reasons, the Court grants Solar Mosaic's motion to compel arbitration

of the Garcias' claims against Solar Mosaic and to stay the Garcias' claims against Solar Mosaic,

Group Solar, and Solar Program pending arbitration.[13]  The Court denies Solar Mosaic's motion

to dismiss, without prejudice.

 The Clerk of Court is respectfully directed to terminate the motions pending at docket

numbers 16 and 42.


 SO ORDERED.

             *Paul A. Engelmayer*
             Paul A. Engelmayer
             United States District Judge


Dated: August 17, 2023
   New York, New York

---

[13] Solar Mosaic argues that the Garcias' class claims cannot proceed against Solar Mosaic because of a class action waiver in the arbitration provision.  *See* Mot. at 10.  In light of the binding arbitration agreement, that argument is properly directed to the arbitrator.