UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RAFAL LOJEWSKI, SMITH GARCIA, DANIELLE
GARCIA, MANUEL ACEVEDO, ISAMAR DELACRUZ, *on
behalf of themselves and all others similarly situated,*

                                    Plaintiffs,

                          -v-

GROUP SOLAR USA, LLC, SOLAR MOSAIC, INC.,
SALAL CREDIT UNION, DANIEL YOMTOBIAN CORP
D/B/A SOLAR PROGRAM,

                                    Defendants.

---

22 Civ. 10816 (PAE)

Opinion & Order

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Rafal Lojewski, Smith Garcia, Danielle Garcia, Manuel Acevedo, and Isamar
Delacruz allege that they were fraudulently induced by defendants to purchase and install solar
panels for their homes.  Dkt. 36 ("First Amended Complaint" or "FAC") ¶¶ 1–2.  They bring
individual claims and claims on behalf of all similarly situated New York consumers against
defendants Group Solar USA, LLC ("Group Solar"), Solar Mosaic, Inc. ("Solar Mosaic"), Daniel
Yomtobian Corp. d/b/a Solar Program ("Solar Program"),[1] and Salal Credit Union ("SALAL").
*See id.* ¶¶ 149–262.

SALAL filed two motions directed to the claims of Lojewski, Acevedo, and Delacruz.[2]
First, SALAL moves to compel arbitration of the claims against it, and, if this motion is granted,

---

[1] Because Group Solar, Solar Mosaic, and Solar Program are related entities and none are parties
to the present motions, this opinion will refer to them collectively as "Group Solar."

[2] SALAL so moves against only the three listed plaintiffs.  This Court previously compelled
arbitration of Smith and Danielle Garcia's claims against Group Solar, Solar Mosaic, and Solar
Program, and stayed their claims while arbitration is pending, while reserving decision on the
present motion.  *See* Dkt. 74 at 2 n.2.

to strike the class claims against it in light of an allegedly applicable class action waiver in the arbitration agreement. *See* Dkt. 46 ("Salal Mot.") at 6–11. Second, it moves to dismiss the claims against it under Federal Rule of Civil Procedure 12(b)(6). *See id.* at 12–24.

For the following reasons, the Court (1) denies SALAL's motion to compel arbitration, and (2) grants in part and denies in part SALAL's motion to dismiss.

**I.      Background**

      **A.      Factual Background[3]**

           **1.      The Parties**

Lojewski is a resident of Brooklyn; Acevedo and Delacruz are residents of the Bronx. FAC ¶¶ 10, 12. Delacruz is the adult step-daughter of Acevedo. *Id.* ¶ 92. Acevedo's "predominate language" is Spanish. *Id.*

SALAL is a state-chartered banking association in Seattle, Washington. *Id.* ¶ 14.

           **2.      Lojewski's Transaction with Defendants**

Early in 2021, Lojewski saw an advertisement on Facebook for Group Solar's residential solar panels. *See* FAC ¶ 19. In response, Lojewski provided his personal information over the internet and received a call from a Group Solar representative to set up a meeting in person. *Id.* After several meetings at Lojewski's residence to discuss possible solar panel installation, he decided to go ahead with the program. *Id.* ¶ 20. Lojewski states that this decision was induced in part by Group Solar's promise that Lojewski would "receive a $3962.92 welcome check after

---

[3] The background recited here is limited to the facts necessary to resolve the pending motions. It thus excludes, *inter alia*, allegations by other plaintiffs. The Court draws this account from the FAC, the operative complaint, and the exhibits attached to the parties' briefs, including the declarations of Lojewski, Dkt. 62 ("Lojewski Decl."), Ex. 2, Acevedo, *id.*, Ex. 4 ("Acevedo Decl."), and Delacruz, *id.*, Ex. 5 ("Delacruz Decl."); the declarations of Peter G. Siachos, Dkt. 47 ("Siachos Decl."), and attached exhibits; and, as explained herein, the declaration of Dale Schroeder, Dkt. 72 ("Schroeder Decl."), and attached exhibits.

the installation of the solar system [was] complete." To this effect, Group Solar provided a "Residential Clean Energy Program" financial worksheet detailing a one-time "Welcome Check Incentive" of $3,862.92. *Id.* ¶ 24.

As part of his registration, Lojewski "signed various documents" including a Retail Installment Contract and Security Agreement ("RIC") listing Group Solar as "seller" but stating that the "contract is assigned to Salal Credit Union . . . without recourse." *Id.* ¶ 23. In addition, SALAL maintains that Lojewski signed, at this point, a membership application ("Application") with SALAL, *see* Schroeder Decl., Ex. 1; Lojewski, however, states that he does not recognize the membership application and to the best of his knowledge was never shown it, Lojewski Decl. ¶¶ 6–7.

Although Lojewski signed up for the program, he received only $1,287.64 from Group Solar, not the $3,862.92 Welcome Check he expected. FAC ¶¶ 25–26. Lojewski and his wife made repeated attempts to get in contact with Group Solar about this discrepancy, to no avail. *Id.* ¶¶ 27–28. At some point, Lojewski reached Group Solar by phone and was told the company had changed management but that it would look into the matter and get back to him. *Id.* ¶ 29. No one got back to Lojewski by phone. *Id.* ¶ 30. On October 4, 2021, a representative from Group Solar responded to one of Lojewski's text messages reiterating that matters were delayed following a change in management but that he had "requested to process your 2nd and 3rd part of Welcome Check few times [sic]" and that "Office assured me that checks will be issued . . . . There are few clients with the same issue. It'll be taken care off [sic] soon." *Id.* ¶¶ 30–31.

Frustrated by the delay, Lojewski placed a freeze on his payments to SALAL. *Id.* ¶ 33. In response, a SALAL representative told Lojewski that if he did not make payments to SALAL on his loan, his credit score would be negatively affected, and that SALAL was not involved

with, and would not offer him relief with respect to, any delay in receiving the full Welcome

Check amount. *Id.* ¶ 35. Concerned about the possible effect on his credit score, Lojewski

removed the freeze and continued making payments on his loan with SALAL. *Id.* ¶ 36.

### 3.     Acevedo and Delacruz's Transactions with Defendants

In mid-2020, Acevedo encountered a post by Group Solar on Instagram detailing its solar

panel program. *Id.* ¶ 89. Acevedo filled out a form indicating interest and Group Solar

contacted him. *Id.* ¶ 90. A Group Solar representative named "James" arranged to meet

Acevedo at his home in New York to discuss the program; Acevedo asked his step-daughter,

Delacruz, to attend the meeting and translate, as Acevedo's "predominate language is Spanish."

*Id.* ¶¶ 91–92.

At this meeting, James set out for Acevedo and Delacruz various incentives provided by

Group Solar as part of its solar panel program, including the provision of Welcome Checks

totaling $4,843.80, apparently to cover the first year of loan payments to buy the solar panels.

*Id.* ¶ 93. Acevedo states that this incentive is referenced in a "Customized Solar Solution

document" as a "Group Solar incentive" totaling $4,843.80. *Id.* ¶ 94. James represented that the

solar panels would generate enough energy to power the three living spaces in Acevedo's home.

*Id.* ¶ 95. As to financing, James "urged" that, given Acevedo's estimated credit score, although

Acevedo should be the main account holder for financing the solar panels, Delacruz should be

listed as a co-signer, as this arrangement would lower the interest rate on the loan. *Id.* ¶¶ 96–97.

Neither Acevedo nor Delacruz signed any documents at this first meeting. *Id.* ¶ 98.

Thereafter, Acevedo decided to move forward with the Group Solar program and contacted

James for another meeting. *Id.* ¶ 99. On November 11, 2020, James returned to Acevedo's

residence; Delacruz, was not present this time as she was "unable to make it[,]" leaving Acevedo

to "rely on his limited English to understand what James was discussing or informing him."

*Id.* ¶¶ 100–01. At this meeting, James presented Acevedo with paperwork to sign, but said that it was just to begin the application process for the panels and that Acevedo would not sign the final contract for financing the panels until a later date. *Id.* ¶¶ 102–04. James stated that they needed Delacruz's signature, but that because she was not present, Acevedo's wife and Delacruz's mother, Fatima Garcia, could sign on Delacruz's behalf. *Id.* ¶ 105. Garcia did so. *Id.* ¶ 106. Although Acevedo states that James had indicated to the contrary, the document he signed on November 11, 2020 was the RIC, which included the assignment to SALAL. *Id.* ¶ 108. As with Lojewski, SALAL maintains that Acevedo and someone bearing Delacruz's signature signed a SALAL membership application on November 10, 2020. *See* Schroeder Decl., Ex. 2. Both Acevedo and Delacruz state that they do not recognize the Application and do not recall ever seeing this agreement. *See* Acevedo Decl. ¶¶ 15–17; Delacruz Decl. ¶¶ 13–15.

Acevedo and Delacruz began receiving charges for the solar panels in December 2020, although the panels were not installed at Acevedo's home until January 2021. *Id.* ¶¶ 109–10. In March 2021, Acevedo received two Welcome Checks totaling $3,229.20, but, despite repeated requests on his part, has never received the third Welcome check. *Id.* ¶¶ 111–12. In September 2021, Acevedo and his wife, after noticing no change to their energy bill save a modest increase, contacted ConEdison, their energy provider, and were told that Group Solar had not done the final processing and activation of the solar panels. *Id.* ¶¶ 113–15. They contacted Group Solar repeatedly to no avail, eventually found a physical address for Group Solar, and spoke to a representative there who initially said the panels had been active since March 2021. *Id.* ¶¶ 116–18. After back and forth with Group Solar, the panels were activated in January 2022, although Acevedo later learned from ConEdison that only one floor of three in his home was connected at this time to the solar panels. *Id.* ¶¶ 119–20.

Acevedo eventually contacted SALAL to inform them of the situation, including that Group Solar was not honoring its promise regarding the Welcome Checks. *Id.* ¶¶ 121–22. SALAL told Acevedo that, as it had "nothing to do with the incentive program," Acevedo still needed to make payments. *Id.* ¶ 123. Acevedo attempted again to complain to Group Solar about the Welcome Checks and solar panel activation, and was told by Group Solar's owner that he would look into the matter and attempt to get SALAL to hold off on seeking payments. *Id.* ¶¶ 124–25. It is unclear whether this ever came to pass.

### 4.    Terms of the Agreements

The parties have produced several documents relevant to SALAL's motion to compel and the plaintiffs' claims against SALAL.

*RICs*: First are two RICs entered into with Group Solar, one signed by Lojewski and one signed by Acevedo and, apparently, Garcia on behalf of her daughter, Delacruz. *See* Dkt. 62, Ex. 1 ("Lojewski RIC"); *Id.*, Ex. 3 ("Acevedo RIC"). These are identical save for the personalized information entered in provided fields. With respect to SALAL, the RICs provide that "[Group Solar] may assign this Contract and the assignee shall have all the rights of [Group Solar] under this Contract. Any assignment by [Group Solar] will not cut off any right of action or defense you may have against [Group Solar]." Lojewski RIC at 4; Acevedo RIC at 4. Further, the RICs contain a section titled "Assignment by Seller" that reads:

> FOR VALUE RECEIVED, the contract herein between Buyer and Seller, and all right, title, and interest of Seller in and to the Property herein described, together with all moneys due or to become due and payable hereunder are hereby sold, assigned, and transferred by Seller to [SALAL] Credit Union, as indicated below.

Lojewski RIC at 5; Acevedo RIC at 5.

*Applications*: SALAL has produced two Applications for membership with SALAL that appear to have been signed by Lojewski and Acevedo and Delacruz, respectively. *See* Schroeder

6

Decl., Exs. 1 ("Lojewski MCA"), 2 ("Acevedo & Delacruz MCA); *see also* Schroeder Decl. ¶¶

16, 18.  The Application, a form document, accomplishes the "opening or creating [of] a new

member relationship with [SALAL.]" Lojewski MCA at 2; Acevedo & Delacruz MCA at 2.

Under a "Membership Agreements and Signatures" header, the Applications cross-reference a

Consumer Membership & Account Agreement ("CMAA").  *See* Lojewski MCA at 3; Acevedo

& Delacruz MCA at 3.  The Applications state:

> If I/We are opening a **deposit account**, I/We agree to be bound by the terms of
> membership above and the conditions of the Consumer Membership & Account
> Agreement (Agreement) and the Consumer Product & Fee Disclosure (Disclosure),
> other account opening documents and to any future amendments made from time
> to time to the Agreement and/or Disclosure.  I/We further understand these terms
> and conditions and any future amendments apply to additional account(s) and
> services requested by me/us. I/We acknowledge receipt of a copy of the Agreement
> and Disclosure.

Lojewski MCA at 3 (emphasis added); Acevedo & Delacruz MCA at 3 (emphasis added).  The

Application further states immediately below the above-listed statement:

> If I/We are currently opening **only a loan account**, and if I/We open a deposit
> account in the future, we understand that we will receive the Consumer
> Membership & Account Agreement and the Consumer Product & Fee Disclosure
> at that time.

Lojewski MCA at 3 (emphasis added); Acevedo & Delacruz MCA at 3 (emphasis added).

**CMAAs**:  SALAL also has produced two versions of the cross-referenced CMAA from

SALAL that SALAL maintains each plaintiff received within a couple of days of signing their

Applications and thereby becoming members of SALAL.  Schroeder Decl., Exs. 3 ("2021

SALAL CMAA"), 4 ("2015 SALAL CMAA").  The CMAA sets out the terms and conditions

associated with SALAL membership.  SALAL submitted two different versions of this CMAA:

one effective 2015 through January 2021, the other effective in January 2021.  *Compare* 2015

SALAL CMAA, *with* 2021 SALAL CMAA.

On SALAL's view of events, because Acevedo and Delacruz allegedly became members on or around November 10, 2020 after signing an Application, they would have received a few days later the CMAA in effect at that time, *i.e.*, the 2015 CMAA. *See* Schroeder Decl. ¶ 19. The 2015 CMAA does not contain an arbitration clause or mention arbitration. *See generally* 2015 CMAA. By contrast, because Lojewski is alleged to have signed his Application in April 2021, on SALAL's view of events, he soon after received the new 2021 CMAA in the mail. *See* Schroeder Decl. ¶¶ 16–17. The 2021 CMAA contains an arbitration clause. *See* 2021 CMAA at 34. Under a heading reading "Binding Arbitration" the 2021 CMAA reads:

> All disputes or claims arising out of or relating to this Agreement, or your use of the Credit Union's products and services offered in the accounts covered under this Agreement, or the relationships that arise from this Agreement or your use of such products and services, whether based in contract, tort or otherwise, **shall be resolved by binding individual arbitration.** This arbitration clause does not apply to disputes arising out of or relating to loans secured by real estate or lending or loan servicing related to such loans.

*Id.* Immediately following this passage, the 2021 CMAA provides, under a heading reading "Class Action Waiver":

> **THE ARBITRATION SHALL BE SOLELY BETWEEN THE PARTIES TO THIS AGREEMENT—YOU AND THE CREDIT UNION. CLASS ARBITRATION, COLLECTIVE PROCEEDINGS OR OTHER REPRESENTATIVE PROCEEDINGS SHALL NOT BE PERMITTED, NOR SHALL YOUR ARBITRATION BE JOINED OR CONSOLIDATED WITH ANY OTHER ARBITRATION.**
>
> **YOU ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT PRECLUDES YOU FROM FILING, PARTICIPATING IN, OR SEEKING ANY RELIEF OR RECOVERY FROM A CLASS ACTION LAWSUIT AGAINST THE CREDIT UNION PENDING IN ANY COURT.**

*Id.* at 34–35.

### B.   Procedural History

On December 22, 2022, plaintiffs filed the Complaint. Dkt. 1. On March 13, 2023, after an extension, SALAL filed its answer. Dkt. 33. On March 24, 2023, plaintiffs filed the First

Amended Complaint ("FAC") after Solar Mosaic moved against the Garcias' claims.[4] *See* Dkts. 25, 36.

The FAC brings four claims, on behalf of a putative class, against all defendants: (1) a claim for deceptive acts and practices under New York General Business Law ("NYGBL") § 349, *et seq.*; (2) a claim for false advertisement under NYGBL § 350; (3) a claim for breach of contract; and (4) a claim pursuant to the Retail Installment Sales Act under New York Personal Property Law ("NYPPL") § 401 *et seq. See* FAC ¶¶ 149–87. The FAC also brings 10 claims for individual (non-class) relief, eight brought by Acevedo and two brought by Delacruz:

1) Breach of implied warranty of merchantability under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.*, brought by Acevedo

2) Breach of express written warranty under the MMWA, brought by Acevedo

3) Unlawful false advertising under NYGBL § 350, brought by Acevedo

4) Breach of contract, brought by Acevedo

5) Negligent hiring, retention, training, and supervision, brought by Acevedo

6) Unjust enrichment, brought by Acevedo

7) Recission/declaration of no liability, brought by Delacruz

8) Breach of express warranty under the New York Uniform Commercial Code ("NY UCC") § 2-313, brought by Acevedo

9) Breach of implied warranty of merchantability under NY UCC § 2-314, brought by Acevedo

10) Theft of identity under NYGBL § 380-s, brought by Delacruz.

---

[4] On February 1, 2023, Solar Mosaic moved to compel arbitration of, and alternatively to dismiss, the Garcias' claims against it, Dkts. 16, 17, and to strike the Garcias' class allegations, Dkts. 19, 20. On August 17, 2023, the Court issued a decision granting the motion to compel arbitration of the Garcias' claims, staying their claims, and dismissing Solar Mosaic's motion to dismiss without prejudice. Dkt. 74.

The FAC bases federal jurisdiction on the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  It alleges that the putative class exceeds 100 members, the aggregate value of their claims exceeds $5 million, and one or more members of the putative class are citizens of a state different from one or more defendants.  FAC ¶ 6.

On April 14, 2023, SALAL filed the present motions to compel arbitration or in the alternative to dismiss Lojewski, Acevedo, and Delacruz's claims against it.   Dkts. 45, 46 ("SALAL Mot.").  On June 2, 2023, Lojewski, Acevedo, and Delacruz filed an opposition.  Dkt. 62 ("Pl. Resp.").  On June 30, 2023, SALAL filed a reply.  Dkt. 71 ("SALAL Reply").

## II.    Applicable Legal Standards

### A.    Motion to Compel Arbitration

The FAA provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).  Congress enacted the FAA to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footing as other contracts."  *Scherk v Alberto-Culver Co.*, 417 U.S. 506, 510–11 (1974) (citation omitted).

"The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (alteration and citation omitted).  "In deciding whether to compel arbitration, a court must first decide whether the parties agreed to arbitrate."  *Zachman v. Hudson Valley Fed. Credit*

*Union*, 49 F.4th 95, 101 (2d Cir. 2022). "Only if the court concludes an agreement to arbitrate exists does it determine (1) the scope of the agreement to arbitrate; (2) whether Congress intended any federal statutory claims asserted to be non-arbitrable; and (3) if some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration." *Id.*; *see also Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008).

On a motion to compel arbitration, "courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 175 (2d Cir. 2003)). Courts thus "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and "draw all reasonable inferences in favor of the non-moving party." *Id.* (citation omitted). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (citation omitted). Where, however, "there is a disputed question of material fact," *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 49 (2d Cir. 2022), "the court shall proceed summarily to the trial thereof," 9 U.S.C. § 4.

The party moving to compel arbitration "must make a *prima facie* initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order). The moving party need not "show initially that the agreement would be *enforceable*, merely that one existed." *Id.* Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington*

11

*v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala v. Randolph*, 531 U.S. 79, 91–92 (2000)).

To determine whether parties have agreed to arbitrate and whether such an agreement is enforceable, courts apply state contract law. *See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993). The parties do not appear to dispute that New York law governs that inquiry here. *See* Def. Mem. at 8–9; *see also* Pl. Opp. at 7–9.

### B.    Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that, accepted as true, "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

A complaint is not required to provide "detailed factual allegations," but must assert "more than labels and conclusions" and more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S at 555. The facts pled "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007); *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999).

## III.    Discussion

SALAL moves to compel arbitration of Lojewski's, Acevedo's, and Delacruz's claims against it. It argues that when plaintiffs signed Applications, they became members of SALAL

bound by SALAL's CMAA, which contained an arbitration clause and a class action waiver. It further argues that these cover the claims in this case. Alternatively, SALAL argues that these claims are inadequately pled. *See* Dkt. 46. Plaintiffs oppose both motions. Dkt. 62.

### A.    Motion to Compel Arbitration

#### 1.    Agreement to Arbitrate

"It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288–89 (2d Cir. 2019). "Mutual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004). "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding enforceable contract." *Express Indus. and Terminal Corp. v. N.Y. State Dept. of Transp.*, 693 N.Y.S.2d 857, 860 (1999). "Where an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Starke*, 913 F.3d at 289. To determine whether an offeree has been put on inquiry notice of a given contractual term, courts in New York look to whether it has been established that the term was "properly called to his or her attention" and "that he or she assented to [it]." 22 N.Y. Jur. 2d Contracts § 29.

Here, SALAL has not made out a *prima facie* showing that an arbitration agreement ever existed between it and the plaintiffs at issue.[5] A review of the course of dealings reveals no

---

[5] Plaintiffs urge the Court to disregard the Applications and CMAAs submitted by SALAL, arguing that these were authenticated in a declaration by a person (SALAL's outside counsel) who was not familiar with SALAL's operations. But any shortcoming along these lines was

plausible basis on which SALAL can argue that plaintiffs were even aware of, let alone bound themselves to, the one extant arbitration clause: that which appeared in the January 2021 version of the CMAA.

The Court begins by taking as true defendants' premise—which plaintiffs dispute—that plaintiffs received and signed SALAL's Application on the same day they signed the RICs with Group Solar.  *See* Lojewski Decl. ¶ 6; Acevedo Decl. ¶ 15; Delacruz Decl. ¶ 13.  The Application stated as follows:

**Membership Agreements And Signatures**

To qualify for Membership, you must not have previously caused the Credit Union a loss unless you have repaid funds owed or are repaying the loss under an agreed upon plan; you must meet all regulatory, legal and internal Credit Union requirements applicable to account opening and membership.

To remain a member of the Credit Union, you must retain at least one active deposit or loan account with the Credit Union.  Once qualified, a member in good standing will remain a member of the Credit Union regardless of whether the member meets the current field of membership qualifications defined within the Credit Union's bylaws.  A person who does not maintain at least one active deposit or loan account ceases to be a member of the Credit Union and must requalify for membership.

If I/We are opening a deposit account, I/We agree to be bound by the terms of membership above and the conditions of the Consumer Membership & Account Agreement (Agreement) and the Consumer Product & Fee Disclosure (Disclosure), other account opening documents and to any future amendments made from time to time to the Agreement and/or Disclosure.  I/We further understand these terms and conditions and any future amendments apply to additional account(s) and services requested by me/us.  I/We acknowledge receipt of a copy of the Agreement and Disclosure.

If I/We are currently opening only a loan account, and if I/We open a deposit account in the future, I/We understand that I/We will receive the Consumer Membership & Account Agreement and the Consumer Product & Fee Disclosure at that time.  Copies of these documents can be viewed anytime at SALALCU.org.

---

cured by the declarations and exhibits that SALAL submitted with its reply. *See, e.g.,* Schroeder Decl. and accompanying exhibits.  Plaintiffs did not seek leave to file a sur-reply to challenge the reply declarations. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) (plaintiff who did not seek leave to file responsive sur-reply could not claim unfair prejudice).

> I/We certify that the information provided here is true and accurate to the best of my/our knowledge and authorize us to check your account, credit and employment history, and obtain a credit report from third parties, including credit reporting agencies, to verify your eligibility for membership and the accounts and/or services you request.

*See* Schroeder Decl., Ex. A at 3.

SALAL contends that this language put plaintiffs on notice that they were assenting to the terms of the CMAA, which, SALAL contends, plaintiffs received in the mail several days after signing the membership Application, *see* Schroeder Decl. ¶¶ 15–16, 18. The Court puts aside for the moment the fact that, as of November 2020 when Acevedo and Delacruz are alleged to have signed the membership Application, the version of the CMAA which contains an arbitration clause—from January 2021—did not yet exist. Even assuming that the January 2021 CMAA version existed at the time all three plaintiffs signed an Application, the Application's text was insufficient to put plaintiffs on actual or inquiry notice of the arbitration agreement.

Critically, it is undisputed that each of Lojewski and Acevedo and Delacruz was—in the language of the Application—"only opening a loan account" with SALAL, and that none had a deposit account with SALAL or later acquired one.[6] The governing language in the Application for these plaintiffs was thus as follows:

> If I/We are currently opening only a loan account, and if I/We open a deposit account in the future, I/We understand that I/We will receive the Consumer Membership & Account Agreement and the Consumer Product & Fee Disclosure at that time. Copies of these documents can be viewed anytime at SALALCU.org.

Schroeder Decl., Ex. A at 3.

---

[6] *See* SALAL Mot. at 4–5; SALAL Reply at 6 ("Plaintiffs do not claim, nor could they, that they are not members with SALAL and/or do not hold loan accounts"); Schroeder Decl. ¶ 11 ("All loan account holders, like Plaintiffs, are members of SALAL.").

This text notifies plaintiffs that they would receive the CMAA *only* if they later opened a deposit account. But it is undisputed that none of the three ever did. It therefore did not ever apply to them.

Lest the point be lost, the immediately preceding clause in the Application drove home that the MCAA was applicable to persons who opened a deposit account:

> If I/We are opening a deposit account, I/We agree to be bound by the terms of the membership above and the conditions of the Consumer Membership & Account Agreement (Agreement) and the Consumer Product & Fee Disclosure (Disclosure), other account opening documents and to any future amendments made from time to time to the Agreement and/or Disclosure. I/We further understand these terms and conditions and any future amendments apply to additional account(s) and services requested by me/us. I/We acknowledge receipt of a copy of the Agreement and Disclosure.

Schroeder Decl., Ex. A at 3.

The contrasting obligations of holders of deposit versus loan accounts were thus drawn sharply. Those who opened a deposit account "agree to be bound by the terms of the membership above and the conditions of the Consumer Membership & Account Agreement and "acknowledge receipt of a copy of the Agreement," *id.*, whereas those who "only open[ed] a loan account" were not so bound. This language does not—and cannot coherently be read to support —SALAL's theory that plaintiffs entered an arbitration agreement.[7]

---

[7] Even if the interplay of the clauses in the Agreement could be read to create ambiguity as to whether parties to loan accounts were bound—and it cannot—such would not supply a basis on which to find plaintiffs on inquiry notice of the MCAA or to have assented to its arbitration clause. *See, e.g., Scotti v. Tough Mudder Inc.*, 97 N.Y.S.3d 825, 835 (Sup. Ct. 2019) (where arbitration clause conflicted with earlier appearing venue and jurisdiction clause, plaintiff was not on inquiry notice due to ambiguity); *Carter v. Ralph Lauren Corp.*, No. 21 Civ. 1202 (PGG), 2023 WL 4684559, at *7 (S.D.N.Y. July 20, 2023) (plaintiff did not assent to be bound by arbitration clause contained in terms and conditions linked to in hyperlink when text of hyperlink did not betray fact that link contained terms that would govern parties' relationship); *cf. Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir. 1995) (clear and unambiguous language can put signer on notice of contractual term)

The Schroeder Declaration submitted by SALAL attests that plaintiffs in the ordinary course would have received copies of the CMAA along with welcome packets that SALAL sent through the mail several days after they signed the Applications. The declaration does not make clear the basis of its premise that signatories to only a loan account would have received the CMAA, which was inapplicable to such accounts. Schroeder Decl. ¶¶ 15–16, 18. Regardless, even crediting that a copy of the CMAA arrived in the mail, its delivery, without agreement, could not bind plaintiffs to its terms. Without agreement, the unrequested and unrequited CMAA had no more legal force than junk mail. *See, e.g., Express Indus. & Terminal Corp.*, 93 N.Y.2d at 860 (court could not analyze claimed "acceptance" of offer without showing of prerequisite of "a manifestation of mutual assent"); *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006) ("If the Court finds substantial ambiguity regarding whether parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract.").

SALAL attempts to avoid this outcome by broadly asserting that loan account holders, like deposit account holders, are members of SALAL, and that all members are bound by the CMAA. *See* SALAL Reply at 4–6. But that is an *ipse dixit*. The Application nowhere says that or anything like it. Its only on-point language is that above, differentiating between holders of deposit and loan accounts, only the former of whom it states agree to be bound by the CMAA. Nor did any other document relevant to plaintiffs say any such thing. SALAL's claim that plaintiffs were on inquiry notice of the arbitration clause of the CMAA thus fails for want of an agreement binding them to that writing. *See Soliman v. Subway Franchisee Advert. Fund Trust, Ltd.*, 999 F.3d 828, 835 (2d Cir. 2021) ("[T]he ultimate question concerning inquiry notice on a motion to compel arbitration [is] whether 'the notice of the arbitration provision was reasonably

conspicuous and manifestation of assent unambiguous as a matter of law.'" (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017)).

In all events, even if the Application's text had bound persons who received the MCAA, such could avail SALAL only as to the claims brought by Lojewski, who signed the membership Application in April 2021, three months after the MCAA version containing the arbitration clause came into being. *See* 2021 CMAA at 34. It could not so bind Acevedo and Delacruz, who signed the Application in November 2020 and, per SALAL, received the then-operative version of the CMAA in the mail several days later.

The Court thus denies SALAL's motion to compel arbitration of the claims by Acevedo, Delacruz and Lojewski. These plaintiffs did not enter into a binding agreement to arbitrate.

### B.     Motion to Dismiss

On SALAL's motion to dismiss under Rule 12(b)(6), the Court first considers plaintiffs' claims on behalf of a putative class and then plaintiffs' individual claims.

#### 1.     Putative Class Claims

##### a.     *The Holder Rule allows plaintiffs to bring the class claims based on derivative liability*

SALAL argues that all putative class claims in the FAC (and many individual claims) against it must be dismissed because those claims, which seek to hold SALAL derivatively liable for conduct by Group Solar, are inconsistent with the "Holder Rule" promulgated by the Federal Trade Commission ("FTC"). SALAL is wrong.

The Holder Rule, promulgated in 1975, requires all consumer installment contracts to contain the following provision:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF.   RECOVERY

HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

16 C.F.R. § 433.2. The Holder Rule was "promulgated in order to cure business practices that 'separated the buyer's duty to pay for goods or services from the seller's reciprocal duty to perform as promised . . . [and where] [c]reditors dunned consumers and collected debts despite consumers' claims and defenses against the sellers.'" *Diaz v. Paragon Motors of Woodside, Inc.*, 424 F. Supp. 2d 519, 544 (E.D.N.Y. 2006) (quoting FTC, 57 Fed. Reg. 28,814, 28,815). The Holder Rule accomplishes this goal by permitting "an individual [subject to a consumer credit contract] to assert all claims and defenses against an assignee that he or she could have asserted against the assignor[.]" *Pierre v. Planet Automotive, Inc.*, 193 F. Supp. 3d 157, 175 (E.D.N.Y. 2016).

Here, the RICs that plaintiffs signed with Group Solar—the rights under which Group Solar contemporaneously assigned to SALAL—consistent with the Holder Rule, contain the above clause. *See* Lojewski RIC at 5; Acevedo/Delacruz RIC at 5. On that basis, certain of plaintiffs' claims seek to hold SALAL liable, as assignee of the RIC, for Group Solar's failure to deliver promised Welcome Checks. *See* Compl. ¶¶ 149–90 (detailing class claims); *id.* ¶¶ 191–242, 250–57 (detailing Acevedo individual claims); *id.* ¶¶ 243–49, 258–262 (detailing Delacruz individual claims).[8] For several reasons, however, SALAL asserts that the Holder Rule does not apply here, requiring dismissal of all claims based on derivative liability. SALAL Mot. at 12–15, 16–17. The Court considers, and rejects in turn, SALAL's arguments to this effect.

---

[8] Lojewski does not bring any individual claims in the First Amended Complaint.

       i.   The Holder Rule applies to plaintiffs' claims concerning the
           Welcome Checks

SALAL first argues that all claims that seek to hold SALAL derivatively liable for Group

Solar's conduct as an assignee of the RIC fail, because the Holder Rule does not apply to such

claims. That is because, SALAL contends, the Holder Rule permits derivative liability claims

only where the "subject matter" of such claims was "obtained pursuant to the contract" at issue.

SALAL Mot. at 13. And here, SALAL states, the Welcome Checks, the subject matter of the

claims were not "obtained pursuant to the contract."

SALAL is wrong. By its plain language, the Holder Rule is not limited to claims the

subject matter of which were "obtained pursuant to the contract." The notice required by the

Holder Rule states that "ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS

SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT

AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO

OR WITH THE PROCEEDS HEREOF." *See* Lojewski RIC at 5; Acevedo/Delacruz RIC at 5.

This sentence does not erect the limitation SALAL imagines. Rather, in categorical terms, it

provides that the holder of a consumer credit contract (SALAL) is subject to *all* the claims and

defenses that the debtor (a plaintiff) could assert against the seller (Group Solar). The balance of

the sentence does not change this result. Its clause "of goods or services obtained pursuant

hereto or with the proceeds hereof" merely defines the seller whose claims the holder is subject

to.

SALAL urges an alternative reading under which that clause substantively limits the

claims that can be brought against an assignee. *See* SALAL Mot. at 13; SALAL Reply at 12.

And, it urges, because the Welcome Checks are not specifically identified in the RICs, plaintiffs'

claims against Group Solar concerning these "goods and services" are outside the scope of the

derivative liability for assignee SALAL permitted by the Holder Rule. That reading does not follow. The Holder Rule does not anywhere refer to the "subject matter" of the claims. Nor does it anywhere qualify its global statement making "all" claims against the seller under the contract capable of being asserted against the assignee. Insofar as plaintiffs can (and do) bring claims against Group Seller under the contract arising from the denial to them of Welcome Checks, the Holder Rule permits them to purse the same against SALAL.

The case law has not read the Holder Rule to limit liability to claims in this or any other pertinent way. *See, e.g., Pierre*, 193 F. Supp. 3d at 176 (rejecting argument that defendant could not be held liable under Holder Rule for fraud and false advertising claims against car dealership because it was "not involved whatsoever in the complained-of advertising by the dealership or the complained-of deceptive practices allegedly directed at plaintiff" (internal quotation marks and citation omitted)); *Ramirez v. National Co-op. Bank*, 91 N.Y.S.2d 280, 283 (1st Dep't 2011) (under Holder Rule, car financer could be liable as assignee for car dealership's allegedly fraudulent conduct, including "a scheme to entice consumers to the dealership with false promises of a cash prize of a free cruise," *id.* at 281); *Pyskaty v. Wide World of Cars, LLC*, No. 15 Civ. 16 (JCM), 2019 WL 917153, at *11–12, *14 (S.D.N.Y. Feb. 25, 2019) (derivative liability viable for assignee based on seller's common law fraud entailing provision of inaccurate used car report).[9]   The Court thus rejects this argument.

---

[9] *Alvizo v. Metro Ford Sales & Serv., Inc.*, No. 1 Civ. 2395 (MEA), 2002 WL 10470, at *2 (N.D. Ill. Jan. 3, 2002), on which SALAL relies, is not persuasive authority to the contrary. It states, in a conclusory matter, that the plaintiff could not maintain a cause of action for assignee liability under the Holder Rule because the subject matter of the suit was unrelated to the contracted goods. *Alvizo* does not give a reason for this result, let alone anchor it in the Holder Rule's text. Further, the "unrelated" claim in *Alvizo* (for conversion after the plaintiff returned a malfunctioning car to the dealer and the dealer thereafter refused to return the bumper stickers plaintiff had affixed) swept much farther afield from the relevant contract (a contract for sale of

    ii.    The Holder Rule and New York law assignee liability provision apply to plaintiffs' New York Retail Installment Sales Act claims

SALAL next argues that the Holder Rule does not apply to the FAC's claim, on behalf of a putative class, under New York Retail Installment Sales Act, NYPPL § 401 *et seq. See* Compl. ¶¶ 175–87. That claim is brought against all defendants. It alleges that Group Solar failed to disclose, in the retail installment contract, its promise to pay the Welcome Checks, in violation of NYPPL §§ 402(2), 402(3), and 413(4). *See id.* ¶¶ 182–85. SALAL, noting that the latter two NYPPL provisions parallel the federal Truth in Lending Act ("TILA"), alleges that, because TILA limits assignee liability, this limitation should extend to plaintiff's claims of such liability under the NYPPL.

That argument, too, fails. TILA indeed limits assignee liability, and courts have held that that statutory limitation trumps the regulatory Holder Rule in the context of claims brought under TILA, precluding TILA claims against assignees based on derivative liability for sellers' conduct. *See Taylor v. Quality Hyundai Inc.*, 150 F.3d 689, 692–94 (7th Cir. 1998); *Ramadan v. Chase Manhattan Corp.*, 229 F.3d 194 (3d Cir. 2000); *Green v. Levis Motors, Inc.*, 179 F.3d 286, 296 (5th Cir. 1999); *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 708–09 (11th Cir. 1998). But by its express terms, that limitation within TILA "makes clear that the assignee liability limitation regarding disclosure statements applies only to a 'civil action for a violation of [TILA].'" *Buelow v. Plaza Motors of Brooklyn, Inc.*, No. 17 Civ. 4288 (LDH) (ST), 2018 WL 11447561, at *5 (E.D.N.Y. Sept. 29, 2018) (quoting 15 U.S.C. § 1641(a)). That language does

---

the car) than the Welcome Check claims do here. And the FTC, in its later pronouncements, has repudiated early cases like this which appeared to graft extratextual scope limitations onto the Rule. *See* Letter from Donald S. Clark, Secretary, FTC, to Jonathan Sheldon, et al., National Consumer Law Center (May 3, 2012).

not apply to a claim under a state law lacking TILA's textual limitation. *See, e.g., id.* (state-law claims for rescission, fraud, misrepresentation, breach of warranty, false advertising, and deceptive sales practices not subject to TILA's limitation on assignee liability); *Ramirez*, 938 N.Y.S.2d at 208 ("Where the plaintiff brings a non-TILA claim under state law, an assignee may be derivatively liable pursuant to the Holder Rule and its New York analogue."). Such is the case here: the NYPPL lacks such a textual limitation.

SALAL does not argue that TILA preempts the relevant provisions of the NYPPL. The Court is unaware of any case so holding or any basis to so argue. *See People ex rel. Spitzer v. Applied Card Sys., Inc.*, 863 N.Y.S.2d 615, 620 (2008) (rejecting broad view of TILA-preemption as applied to other New York consumer protection law). Courts have entertained claims under TILA and the parallel provisions of NYPPL in the same action, without holding that the similarities between the two must render the NYPPL provisions preempted. *See, e.g., Orlosky v. Empire Sec. Systems, Inc.*, 657 N.Y.S.2d 840, 842 (3d Dep't 1997); *Manzina v. Publishers Guild, Inc.*, 386 F. Supp. 241, 242 (S.D.N.Y. 1974).

Plaintiffs may therefore pursue this claim against SALAL.

### b. Direct liability under NYGBL § 349 (first class claim for relief)

The FAC alleges that SALAL is directly liable for deceptive consumer acts and practices under NYGBL § 349. FAC ¶¶ 138–47. That claim is based on SALAL's "recurring policy and practice of misinforming consumers regarding . . . Salal Credit Union's legal obligations and responsibilities." *Id.* ¶ 145. In moving to dismiss, SALAL argues that this claim fails to allege (1) any deceptive practices by SALAL at the time it entered into the financing agreements and (2) actual injury. The Court agrees with SALAL on the latter point, and dismisses this claim as brought against SALAL.

23

To state a claim under NYGBL § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 944 N.Y.S.2d 452, 452 (2012)). A plaintiff must allege actual injury, but such need not take the form of pecuniary harm. *See Stutman v. Chem. Bank*, 709 N.Y.S.2d 892, 896 (2000).

The Court assumes *arguendo* that the FAC adequately alleges materially misleading, consumer-oriented conduct by SALAL, to wit, its representations to plaintiffs that it was not involved with and could not do anything about the Welcome Checks in its assignee capacity. *See* FAC ¶ 157. But the FAC does not allege any actual injury (pecuniary or otherwise) as a result of SALAL's conduct. Instead, it states, without elaboration, that SALAL's practices "[have] a broad impact on consumers" and that "due to these violations of NYGBL § 349, Plaintiff has suffered actual damages[.]" *Id.* ¶¶ 159–60.

In opposing the motion to dismiss, plaintiffs state that SALAL's conduct prevented or delayed them from receiving their Welcome Check payments, and/or discouraged them from suing SALAL. Pl. Resp. at 24. The FAC does not plead facts to this effect. And plaintiffs do not explain how SALAL's alleged misrepresentations prevented them from receiving Welcome Checks sooner, or why, given the present action, this conduct inhibited plaintiffs' ability to vindicate their rights in court. *See* Dkt. 1 (initial complaint listing SALAL as a defendant). The FAC therefore fails to state a § 349 claim against SALAL. *See, e.g., Smith v. Chase Manhattan Bank, USA, N.A.*, 741 N.Y.S.2d 100, 102 (2d Dep't 2002) (dismissing § 349 claim where allegations failed to make out actual injury); *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 143 (E.D.N.Y. 2018) ("[P]laintiff's conclusory allegations are insufficient to identify a

cognizable injury.  Plaintiff, therefore, fails to state a claim for relief under Section 349[.]");

*Harris v. Duchness Cnty. Bd. of Co-op Educ. Servs.*, 25 N.Y.S.3d 527, 544 (2015) (dismissing §

349 claims because plaintiffs' allegations going to actual injury were insufficient).

### 2.  Acevedo's Individual Claims

#### a.  *MMWA claims (first and second individual claims for relief)*

##### i.  SALAL can be held derivatively liable only for implied warranty claims, not express warranty claims, under the MMWA.

The FAC brings individual claims on Acevedo's behalf against all defendants based on

violations of both express and implied warranties under the MMWA.  FAC ¶¶ 191–214.  SALAL

argues that an MMWA limitation on assignee liability trumps the Holder Rule and bars these

claims against it, because it (1) is not alleged to have been a direct warrantor and (2) cannot be

derivatively liable.  SALAL Mot. at 17–19.  SALAL's challenge to the express warranty claims

is meritorious, but its challenge to the implied warranty is not.

Under the MMWA, "a consumer who is damaged by the failure of a supplier, warrantor,

or service contractor to comply with any obligation under the [MMWA] or under written

warranty, implied warranty or service contract may bring suit for damages and other legal and

equitable relief . . . ."  15 U.S.C. § 2310(d)(1).  Salient here, with respect to warrantor liability,

the MMWA provides:

> For purposes of this section, only the warrantor actually making a written affirmation of fact, promise, or undertaking shall be deemed to have created a written warranty, and any rights arising thereunder may be enforced under this section only against such warrantor and no other person.

*Id.* § 2310(f).  As the text and case law make clear, this statutory provision limits assignee

liability for claims of express warranty, and trumps the regulatory Holder Rule.  *See Pierre*, 193

F. Supp. 3d at 174–75 (collecting cases).  Plaintiffs themselves concede that express warranty

claims cannot be brought against SALAL, as an assignee and not a direct warrantor, under the

MMWA. Pl. Resp. at 26. The Court thus will dismiss Acevedo's express warranty claim (his

second individual claim) against SALAL. See, e.g., *id.* at 174–75 (claim for breach of express

warranty under MMWA cannot be had against assignee); *Buelow*, 2018 WL 11447561, at *3

(same); *Cotterell v. Gen. Motors LLC*, No. 19 Civ. 822 (MPS), 2019 WL 6894256, at *8 (D.

Conn. Dec. 18, 2019) (same).

As to claims regarding implied warranty, courts have reached conflicting results about

whether the MMWA displaces the Holder Rule. *Compare, e.g., Diaz*, 424 F. Supp. 2d at 544

(MMWA does not displace Holder Rule), *with, e.g., Pierre*, 193 F. Supp. 3d at 175 (MMWA

does displace Holder Rule). Although the statute is not pellucid on this point, this Court finds

most persuasive the construction that the MMWA does not displace the rule, based on a

comparison of the text of two MMWA provisions. Section 2310(d)(1), which sets out the causes

of action available under the MMWA, states that a consumer can bring suit for failure to comply

with an obligation under "written warranty, implied warranty, or service contract[.]" Section

2310(f), which sets out the limitation on assignee liability, states that the warrantor will be

"deemed to have created a written warranty, and any rights arising thereunder may be enforced

under this section only against such warrantor and no other person." The former makes clear

that the MMWA pertains to claims for failures to abide both express and implied warranties,

whereas the latter, in limiting assignee liability, refers only to written, not implied, warranties.

The most logical inference is that Congress did not intend to displace assignee liability as to

implied warrantees. *See Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that

Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and

26

our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

The Court accordingly sustains the FAC's claim against SALAL of a breach of implied warranty, and dismisses only the express warranty claim under the MMWA.[10]

      ii.    Plaintiffs insufficiently pled breach of implied warranty under New York state law

SALAL next challenges the MMWA claim of a breach of the implied warranty of merchantability, on the ground that the FAC does not allege that the solar panels were unfit for ordinary use or otherwise defective, as New York law requires. SALAL is correct.

"To state a claim under the MMWA, plaintiffs must adequately plead a cause of action for breach of . . . implied warranty under state law." *Garcia v. Chrysler Group LLC*, 127 F. Supp. 3d 212, 232 (S.D.N.Y. 2015). Here, the FAC brings a claim for breach of the implied warranty of merchantability under New York law. *See* FAC ¶¶ 203–05. To prevail on such a claim, "a plaintiff must show that the product at issue is not 'fit for the ordinary purposes for which such goods are used' and it caused injury as a result." *Boateng v. Bayerische Motoren Werke Aktiengesellschaft*, No. 17 Civ. 209 (KAM) (SIL), 2022 WL 4357555, at *21 (S.D.N.Y. Sept. 20, 2022) (citing *Brazier v. Hasbro, Inc.*, No. 99 Civ. 11258, 2004 WL 515526, at *4 (S.D.N.Y. Mar. 16, 2004)).

The FAC does not plead facts plausibly alleging that the solar panels were not "fit for the ordinary purposes for which such goods are used." *Id.* It alleges that for almost a year after installation, Acevedo's panels were not finally activated or processed by Group Solar, and thus

---

[10] SALAL argues that the RIC appears to disclaim implied warranties. SALAL Reply at 15. But such a disclaimer would be invalid, as the MMWA prohibits disclaimers of implied warranties in connection with the sale of a consumer product, when, *inter alia*, there is also a written warranty as to the consumer product. 15 U.S.C. § 2308(a).

did not produce energy for his house or reduce his energy bill. *See* FAC ¶¶ 113–15. It alleges that even after the panels were "officially activated," "only one floor was connected to the panels when it was supposed to be all three." *Id.* ¶¶ 119, 120. The FAC states that Acevedo futilely complained to Group Solar about the "solar panel activation." *Id.* ¶ 124. But these allegations do not speak to whether the solar panels were "fit for the ordinary purposes for which such goods are used." The FAC instead faults Group Solar for different lapses: failing to do final processing and activation. *See* FAC ¶¶ 113–15, 124. Critically, the FAC does not contain any allegations of any inherent defect in the panels themselves. It can be read to suggest that the panels were improperly installed in addition to not being activated, in that, even after activation, they were connected only to the first floor. FAC ¶¶ 119–20. But the FAC does not state who installed the panels or that they were unfit for installation. *See* FAC ¶ 109 ("The panels were not installed until January of 2021"). Thus, although the FAC pleads human lapses such as in connection with installation, it does not plead a breach of the implied warranty of merchantability. *See, e.g.,* *Fischer v. Zervas*, 153 N.Y.S.3d 823, 827 (N.Y. Sup. Ct. 2021), *reargument denied,* 164 N.Y.S.3d 808 (N.Y. Sup. Ct. 2022) (allegation of improper installation can defeat claim for breach of implied warranty of merchantability).

The Court thus grants the motion to dismiss the claim for breach of implied warranty under the MMWA. *See, e.g.,* *Bynum v. Fam. Dollar Stores, Inc.*, 592 F. Supp. 3d 304, 315 (S.D.N.Y. 2022) (dismissing claim for breach of implied warranty of merchantability where complaint failed to allege that product was unfit for ordinary use); *Lin v. Canada Goose US, Inc.*, 640 F. Supp. 3d 349, 363 (S.D.N.Y. 2022) (dismissing claim for breach of implied warranty of merchantability where alleged deficiencies were orthogonal to product's intended use as outerwear).

> b. *New York UCC claims (eighth and ninth individual claims)*

The FAC brings claims on Acevedo's behalf against SALAL for breach of express and implied warranties under New York contract law. For similar reasons that the FAC does not state a claim for breach of implied warranty of merchantability under New York contract law, these do not state a claim.

Section 2-313 of the New York Uniform Commercial Code ("UCC") provides:

> (1) Express warranties by the seller are created as follows:
>
>> a. Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>> b. Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>> c. Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

N.Y. U.C.C. § 2-313. The FAC alleges that Group Solar created and breached written express warranties as to the condition of the solar panels and the nature and quality of the workmanship of its technicians. FAC ¶¶ 209–10. These claims, Acevedo states, arise from the breach of express oral warranties by Group Solar and SALAL with respect to the condition and operational efficacy of the panels, the timing of their installation, their operational date, and their financing structure. Pl. Resp. at 30.

Under New York law, an express warranty under this provision arises from a description or showcasing of some aspect of the goods to be sold, which then becomes part of the basis of

the bargain. *See* N.Y. U.C.C. § 2-313. "Goods" as defined in the New York UCC are "all things . . . which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities . . . and things in action." *Id.* § 2-205. The solar panels certainly constitute goods under this definition. But the FAC's theory of breach, relating to warranties about the timing of their installation, their operational date, and their financing structure do not qualify as affirmations, promises, descriptions, samples, or models to which "the goods [could] conform." *Id.* § 2-313. Statements about the timing of the installation of a good, when the good will be operational (*i.e.*, installed and activated), and how they will be financed instead describe services surrounding the goods, not attributes, features, or conditions of the goods themselves. Such statements can be actionable under other legal theories, but they do not give rise to an express warranty under NY UCC Section 2-313. *Cf. Milau Assocs. V. N. Ave. Dev. Corp.,* 398 N.Y.S.2d 882, 885–86 (1977) (no implied warranty under NY UCC or New York common law for service-oriented transaction); *KSW Mech. Services v. Johnson Controls, Inc.*, 992 F. Supp.2d 135, 141–42 (E.D.N.Y. 2014) (contract for services governed by NY UCC because also involved sale of goods itself).

The FAC's allegation that Group Solar made and breached an express warranty as to the condition and operational efficiency of the solar panels, in contrast, is potentially actionable under these laws. But, as to this claim, the FAC is devoid of concrete factual allegations that the panels themselves were defective or failed to meet expectations concerning their use. As such, it does not plead this theory of breach of express warranty.

The Court thus finds that the FAC does not state a claim under New York law for breach of express or implied warranty, and dismisses these claims. *See, e.g., Milau Assocs.*, 398 N.Y.S.2d at 885–86; *Catalano v. BMW of N.A., LLC,* 167 F. Supp. 3d 540, 555 (S.D.N.Y. 2016)

(dismissing express warranty claim where conclusory allegations failed to allege defects covered by warranty); *Catalano v. MarineMax*, 590 F. Supp. 3d 487, 509 (E.D.N.Y. 2022) (same).

### c.   NY GBL § 350 (third individual claim)

SALAL next challenges the FAC's claim on Acevedo's behalf under NY GBL § 350 for false advertising.  To make out such a claim, a plaintiff must allege "(1) consumer-oriented conduct that is (2) materially misleading; and that (3) resulted in injury to Plaintiffs." *Harris*, 25 N.Y.S.3d at 538.  The FAC's claim is that Group Solar promised Acevedo Welcome Checks as part of his participation in the solar panels program, but did not deliver these.  SALAL argues that this theory fails because: (1) SALAL cannot be held derivatively liable for Group Solar's conduct, (2) the conduct alleged is not "consumer-oriented," and (3) the FAC does not identify a "false representation" made in writing.  SALAL Reply at 16.  These arguments are easily put aside.

First, as reviewed above, under the Holder Rule, Acevedo can seek to hold SALAL derivatively liable as an assignee of Group Solar's.

Second, the FAC adequately pleads that the alleged conduct was "consumer-oriented." The FAC alleges a meeting at which a Group Solar representative, James, described the Welcome Check incentive program to Acevedo and Delacruz and provided a Customized Solar Solution document that referenced the incentive program. *See* FAC ¶¶ 93–94.  And it alleges that the (false) promise to deliver Welcome Checks was part of a broader marketing practice by Group Solar to consumers. *Id.* ¶¶ 132–33.  These factual allegations plead consumer-oriented false advertising. *See, e.g.*, *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.S.2d 529, 533 (1995) (defendant bank's conduct in providing forms and advice to plaintiff non-profits that were also provided to anyone seeking to open certain accounts was

consumer-oriented); *Gaidon v. Guardian Life Ins. Co. of Am.*, 704 N.Y.S.2d 177, 182–83 (1999) (when defendant insurance companies gave plaintiff standard marketing presentation, conduct was consumer-oriented because "[i]n contrast to a private contract dispute as to policy coverage, the practices before us involved an extensive marketing scheme that had a 'broader impact on consumers at large'" (quoting *Oswego*, 85 N.Y.S.2d at 533)). SALAL does not explain what about the allegations here made Group Solar's conduct something other than consumer-oriented.

Third, there is no independent requirement under Section 350 that the false advertising occur in writing. *See Harris*, 25 N.Y.S.3d at 538. And even if there were, the FAC alleges that James conveyed the Welcome Checks program to Acevedo both orally and in writing. FAC ¶¶ 93–94. To the extent that SALAL's beef is that Acevedo has not produced such a writing, such a lapse, if any, would not be a basis for a motion to dismiss under Rule 12(b)(6), at which time the issue is instead whether the complaint pleads "enough facts to raise a reasonable expectation that discovery will reveal evidence" of liability. *Twombly*, 550 U.S. at 556. Here, the FAC's false advertising claim pleads all elements of Section 350.

The Court therefore denies SALAL's motion to dismiss this claim.

### d. Negligent hiring (fifth individual claim)

SALAL next argues that the FAC's claim on Acevedo's behalf of negligent hiring fails. To state a claim for negligent hiring, retention, training, and supervision, a plaintiff must plead facts raising the inference that, *inter alia*, "the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Stevens v. Keller*, 112 A.D.3d 1206, 1209 (3d Dep't 2013).

In attempting to so plead here, the FAC appears to allege that Group Solar representative James falsely advised Acevedo about the contract, caused him to sign it without Delacruz present

32

despite Acevedo's limited English fluency, and told Delacruz's mother that she could sign in her daughter's place. *See* FAC ¶¶ 231–37. The FAC, however, does not allege facts putting Group Solar on notice that James would conduct himself in such a manner. Beyond stating that James was a Group Solar employee, the FAC says nothing about him. And the nature of its allegations suggests impromptu conduct by James; this does not suggest that James' improprieties in the meeting with Acevedo to cause the contract to be executed, largely stemmed from the absence of Delacruz, were part of a pre-arranged plan. More is required to state a claim against Group Solar for negligent hiring. *See, e.g.*, *Selechnik v. L. Off. of Howard R. Birnbach*, 920 N.Y.S.2d 128, 131 (2d Dep't 2011) (complaint adequately pled negligent hiring claim where it alleged that law firm knew or should have known that non-lawyer employee imbued with apparent authority by employment would make false representations, including because plaintiff's real estate attorney had called law office multiple times asking to speak with employee); *Doe v. Alsaud*, 12 F. Supp. 3d 674, 680–83 (S.D.N.Y. 2014) (lack of allegations of employer knowledge of employee's propensity to mislead "fatal" to negligence claims). The Court accordingly dismisses the claim for negligent hiring, based on the absence of allegations plausibly pleading that Group Solar knew or should have known about James's alleged misconduct.

   *e. Breach of contract (fourth individual claim)*

  SALAL next challenges the FAC's claim of breach of contract. To state such a claim, a plaintiff must allege facts tending to show four elements: "(1) the existence of a contract, (2) performance of the contract by the plaintiff, (3) breach by the defendant, and (4) damages suffered as a result of the breach." *Ebomyonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338, 347 (S.D.N.Y. 2020) (citing *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)). "Conclusory allegations that a contract existed or that it was breached do not suffice." *Emerald*

*Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co.*, No. 16 Civ. 1099 (NSR), 2017 WL 1383773, at *7 (S.D.N.Y. Apr. 12, 2017).

The FAC clearly alleges the existence of a contract between Acevedo and Group Solar, performance on Acevedo's part, and damages. *See* FAC ¶¶ 224–30. Its pleadings as to the element of breach are murkier. The FAC alleges that "[i]n the contracts, Group Solar agreed to install functional solar panels. However, Group Solar failed to install operable solar panels." *Id.* ¶ 227–28. The use of the plural for "contracts" is confusing in that Acevedo is alleged to have entered into only one contract; the Court assumes that the use of the plural was either errant or awkwardly intended to refer to the contracts with all plaintiffs. The FAC also does not specify the contractual provision that was breached. Nonetheless, the FAC does allege that the contract required the installation of operable solar panels and that Group Solar failed "to install operable solar panels." FAC ¶¶ 228–229. Although this allegation leaves something to be desired, including in that it does not clarify whether panels were not installed or were installed but not operable, this allegation ultimately does plead enough to put SALAL on notice of the contractual promise (installation of operable panels) that was breached. The Court therefore denies the motion to dismiss this claim.[11] *See, e.g., Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, No. 22 Civ. 2943 (PAE), 2023 WL 3868585, at *12 (S.D.N.Y. June 7, 2023) (breach adequately pled where allegations in operative complaint that defendant had not met identified obligation in contract); *Winston Salem RI LLC on behalf of S. Bend Hotel Owner LLC v. Ladder Cap. Fin. LLC*, 192 N.Y.S.3d 58, 60 (1st Dep't 2023) ("[T]here is no heightened pleading requirement for breach of contract claims and plaintiff need not cite the specific

---

[11] In his brief, Acevedo appears to suggest that this claim may also concerns Group Solar's failure to exercise reasonable care in selecting, instructing, and supervising its employees. Pl. Resp. at 33. That theory of contract breach is inadequately pled and may not be pursued.

provisions of the contract it alleged was violated to avoid dismissal."); *E. Materials Corp. v. Mitsubishi Plastics Composites Am., Inc.*, 307 F. Supp. 3d 52, 60 (E.D.N.Y. 2018) ("[T]he Plaintiffs' identification of the contract-at-issue as well as the specific provisions upon which the claim is based is legally sufficient.").

### f. Unjust enrichment (sixth individual claim)

Finally, SALAL moves to dismiss the FAC's claim on Acevedo's behalf of unjust enrichment as duplicative of its breach of contract claim.

Unjust enrichment "lies as a quasi-contract claim" that "contemplates 'an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.'" *Georgia Malone & Co. v. Rieder*, 950 N.Y.S.2d 333, 336 (2012) (citation omitted). The New York Court of Appeals has emphasized, however, that "unjust enrichment is not a catchall cause of action to be used when others fail." *Corsello v. Verizon N.Y., Inc.*, 944 N.Y.S.2d 732, 740 (2012). Rather, the claim "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.* "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id.*

Here, the FAC's unjust enrichment claim on Acevedo's behalf essentially tracks his breach of contract claim, which the Court has sustained. To the extent the two may differ, the FAC's conclusory language, which sounds in breach of contract, is inadequate to explain how. The FAC merely alleges that it is "unjust and inequitable for Defendants to retain [Acevedo's] money . . . without providing [him] with the services paid for, or by charging more than the equipment or services are worth in the form of concealed discounts between the Defendants."

35

FAC ¶ 242. The Court accordingly dismisses the unjust enrichment claim as duplicative. *See, e.g., Patellos v. Hello Prods., LLC*, 523 F. Supp. 3d 523, 537–38 (S.D.N.Y. 2021) (dismissing unjust enrichment claim as duplicative of other tort and contract law claims sustained); *Gov't Emps. Ins. v. Zemlyansky*, No. 13 Civ. 4966 (MKB) (SMG), 2015 WL 5692899, at *2 (E.D.N.Y. Sept. 27, 2015) ("[A]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." (internal alteration omitted)); *Cont'l Cas. Co. v. Contest Promotions NY, LLC*, No. 15 Civ. 501 (MKB), 2016 WL 1255726, at *3–4 (E.D.N.Y. Mar. 28, 2016) (denying motion for default judgment where unjust enrichment claim duplicative of breach of contract claim).

### 3.   Delacruz's Individual Claims

#### a.  Recission (seventh individual claim)

SALAL argues that Delacruz's claim for recission of the RIC and related contracts is barred due to unreasonable delay. SALAL is correct.

"Where a party desires to rescind upon the ground of mistake or fraud, he must, upon discovery of the facts, at once announce his purpose, and adhere to it. . . . He is not permitted to play fast and loose." *Gryymes v. Sanders*, 93 U.S. 55, 62 (1876). Consistent with this principle, New York law requires a party to act without unreasonable delay after learning of the grounds for rescission. *Ballow Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235, 239–40 (2d Cir. 2006). The inquiry into whether a delay was reasonable is ultimately a "malleable standard that comports with the overall equitable nature of [the] remedy." *Id.* at 240.

On the undisputed facts, Delacruz's delay in moving to rescind the RIC after learning that her mother had signed it on her behalf was clearly unreasonable. Delacruz's mother allegedly signed the financing agreement on her behalf on November 11, 2020. FAC ¶ 100. Although the FAC does not specify the date when Delacruz learned a contract in her name had been signed by

36

another, it alleges that she began getting charges in connection with it in December 2020. *Id.* ¶ 110. The only rational inference is that, by that time, Delacruz became aware of a contract that she claims had been executed on her behalf without her consent. She did not, however, file suit until December 2022, nearly two years later. *See* Dkt. 1. The FAC does not allege that Delacruz ever attempted to rescind the contract before filing this lawsuit.

This delay was unreasonable both because of its duration, and because Delacruz has not anywhere alleged that she attempted to rescind earlier or set out facts mitigating her failure to do so earlier. In her opposition, Delacruz merely notes that the withholding of Welcome Checks and the failure of the solar panels to be activated did not become apparent until September 2021. *See* Pl. Resp. at 34. But those facts go to the agreement's breach, not its inception. Delacruz's recission claim, in contrast, attacks the alleged fraudulent process by which the agreement was executed. That the agreement was later breached does not excuse Delacruz's failure to pursue rescission earlier. If anything, Delacruz's having delayed pursuit of rescission until the point of breach suggests that, had the agreement not been breached, she would have been content to be bound by it.

Under these circumstances, Delacruz's rescission bid is barred by her unjustified and substantial delay in pursuing this remedy. The Court accordingly dismisses the claim for rescission. *See, e.g., GuideOne Specialty Mut. Ins. Co. v. Congregation Adas Yer*eim, 593 F. Supp. 2d 471, 484 (E.D.N.Y. 2009) (10-month delay in seeking recission after plaintiff had full knowledge of facts was unreasonable); *In re Schick*, 232 B.R. 589, 596 (Bankr. S.D.N.Y. 1999) (party could not seek rescission after taking no steps to do so after learning of fraud for over a year).

### b. *Theft of identity (10th individual claim)*

37

SALAL, finally, moves to dismiss Delacruz's claim for identity theft under NY GBL § 380-s, arguing that it is both time-barred and insufficiently pled.  Neither argument is persuasive.

The FAC alleges that Group Solar is liable for identity theft as it knowingly and willfully created the RIC "in Delacruz's name" and enforced that RIC against her, despite the fact that Delacruz was not present when the RIC was signed, did not herself sign it, and did not give her mother permission to sign on her behalf.  *See* FAC ¶¶ 258, 260.  Further, the FAC alleges that the creation of the RIC in Delacruz's name caused false information to be transmitted to one or more credit agencies.  *Id.* ¶ 261.

SALAL's first argument is that this claim is untimely on the face of the complaint, so as to permit dismissal on the pleadings.  Salal Mot. at 24–25 (citing *Baker v. Cuomo*, 58 F.3d 814, 818–19 (2d Cir. 1995)).  In the context of a claim under Section 380-s, dismissal would be warranted were it apparent on the face of the Complaint that more than two years passed between the time Delacruz discovered the alleged identity theft and December 22, 2022, when she filed this action.  *See* NY GBL § 380-n (action may be brought any time within two years after the discovery of the misrepresentation).

Construing the FAC in the light most favorable to non-movant Delacruz, it does not clearly reveal her claim as time-barred.  The FAC plausibly alleges Delacruz became aware sometime in December 2020 that Group Solar claimed that she was party to a contract, as it was charging her based on that contract.  However, the FAC does not set out the date in December 2020 when she learned that fact.  It is therefore consistent with the FAC that Delacruz learned of this fact within (albeit barely) two years of her bringing suit.  FAC ¶ 110.  The FAC also leaves open the possibility that Delacruz, while appreciating that she was being charged based on a

contract that she had not personally signed, did not appreciate until later the facts that would give rise to a claim of identity theft. The Court accordingly denies the motion to dismiss on the ground of untimeliness, without prejudice to SALAL's right to renew a claim of untimeliness on summary judgment, should discovery bear out that contention. *See, e.g.*, *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 210 (S.D.N.Y. 2014) (denying motion to dismiss for untimeliness where plausible on face of complaint that claim was timely); *Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013) (same); *Primerano v. Vornado Air, LLC*, No. 5:15 Civ. 881 (TJM), 2016 WL 8541050, at *1 (N.D.N.Y. June 14, 2016) (same).

SALAL's second argument is that the FAC inadequately pleads the intent element of a claim of identity theft. To plead a violation under NY GBL § 380-s, a complaint must allege facts showing "someone misappropriate[d] another person's name . . . to engage in fraud or other crimes" and this "resulted in the transmission or provision to a consumer reporting agency of information that would otherwise not have been transmitted or provided." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 441, 446 (2d Cir. 2015). For the conduct to be actionable, the defendant must have acted within intent to defraud. NYGBL § 380-s.

The FAC so pleads here. SALAL's seizes on an aspect of Acevedo's meeting with James in which, as pled, "James . . . stated that they needed Ms. Delacruz's signature but given that she not [sic] available, Mr. Acevedo's wife, Ms. Fatima Garcia, who was present, could sign on her behalf as her mother." FAC ¶ 105. SALAL suggests that the use of the word "could" by James implies that James did not act with intent to defraud. SALAL, however, takes that word out of context. Viewing the FAC's allegations about this episode in totality, it plausibly alleges that James intentionally misled Acevedo, whom he appreciated did not predominantly speak English,

39

to cause his wife to fabricate their daughter Delacruz's signature without Delacruz's assent, and that James did so to take advantage of Delacruz's favorable credit score and history. *See* FAC ¶¶ 94–106. These allegations plausibly allege James' intent to defraud Delacruz by causing her assent to the agreement to be falsely entered. *See Bigas v. Kryla*, No. 621288/2019, 2020 N.Y. Misc. LEXIS 16978, at *7–8 (Suffolk Cnty. Sup. Ct. Sept. 24, 2020) (GBL § 380-s claim plausibly alleged by allegation that defendant knowingly "attempted to obtain and/or obtained services in plaintiff's name" without his consent and that he suffered damages to his credit as a result); *cf. Prignoli v. Bruczynski*, No. 20 Civ. 907 (MKB), 2021 WL 4443895, at *9–10 (E.D.N.Y. Sept. 28, 2021) (complaint did not state § 380-s claim where it contained conclusory allegations that defendant knowingly misappropriated identity).

The Court thus denies the motion to dismiss this claim.

## CONCLUSION

For the foregoing reasons, the Court denies SALAL's motion to compel, and grants SALAL's motion to dismiss in part and denies in part.

The Court has dismissed the following claims in the First Amended Complaint: (1) any class claim for direct liability under NYGBL § 349 alleged against SALAL (this holding does not affect any class claim brought under § 349 against SALAL on a theory of derivative liability); (2) Acevedo's claims against SALAL for breach of express and implied warranty

under the MMWA and the NY UCC, negligent hiring, and unjust enrichment; and (3) Delacruz's

claim against SALAL for recission.  All other claims survive.

     The Clerk of Court is respectfully directed to close the motion pending at Docket 45.


     SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: December 21, 2023
     New York, New York